EXHIBIT "C" TO
SHONEY'S OPPOSITION

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| MAC EAST, LLC,<br>an Alabama Limited Liability<br>Corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO.:<br>2:05-CV-1038(F) |
| SHONEY'S, INC.,<br>a Tennessee Corporation, | ) ) ) ) | |
| Defendant. | ) | |

## AFFIDAVIT OF DONNA POWER

STATE OF TENNESSEE    )
COUNTY OF DAVIDSON    )

Before me, the undersigned notary public in and for said state and county, personally appeared **DONNA POWER**, who being duly sworn on oath deposes and states as follows:

1.    My name is Donna Power. I am over the age of nineteen, and competent and have personal knowledge of the facts set forth herein.

2.    Attached hereto as Exhibit A is a true and correct copy of that certain Lease dated April 13, 1979 (the "Lease") by and between Wylie P. Johnson and wife, Lurene H. Johnson (as the landlord) and Shoney's, Inc. (as the tenant), with respect to that certain real property known as 805 Eastern Bypass, Montgomery, Alabama.

3.    Shoney's, LLC, as successor-in-interest to Shoney's, Inc. ("Shoney's") has not been released by the landlords from its obligations under the Lease.

4.    Attached hereto as Exhibit B is a true and correct copy of that certain Proposal to Sub-Lease to City Café Diners dated April 18, 2005, submitted by the plaintiff, Mac East, LLC, to Shoney's, in response to Shoney's First Discovery Request.

5.    Attached hereto as Exhibit C is a true and correct copy of that certain draft sublease submitted by Mac East, LLC to Shoney's via facsimile on May 23, 2005.

6.     To the best of my knowledge and belief, (i) the Property the subject of this lawsuit has now been subleased to Shorest 1115, LLC with the consent of Shoney's, and (ii) the initial lease term thereunder lasts until March 30, 2014.

7.     Based on information and belief, the amount of annual base rent that is due under the Lease is $33,000.

IN WITNESS WHEREOF, I have hereunto set my signature and seal this 18th day of April, 2006.

_Donna Power_

DONNA POWER

Sworn to and subscribed before me this 18th day of April, 2006.

_Susan Dierolf Harris_
NOTARY PUBLIC
My Commission Expires: November 24, 2007

SUSAN DIEROLF-HARRIS
NOTARY PUBLIC
AT LARGE
DAVIDSON COUNTY, TENN.

My Commission Expires NOV. 24, 2007

2

08/28/2001 12:10 FAX 615 231 2889    SHONEY'S REAL ESTATE    @004

EXHIBIT "A"

<span style="float:right">**Exhibit A to Power Affidavit**</span>

L E A S E

THIS LEASE, made and entered into this 13th day of April,
19 79, by and between Wylie P. Johnson and wife, Lurene H. Johnson, hereinafter
referred to as "Lessor", and Shoney's, Inc., a Tennessee corporation, herein-
after referred to as "Lessee".

WITNESSETH:

.1. PREMISES. For and in consideration of the covenants and agree-
ments herein made, Lessor does hereby lease and demise unto the Lessee, and
Lessee does hereby take and rent from the Lessor, all that land or real
property (hereinafter sometimes referred to as the "Premises") described as
follows:

> Lot "G", Plat No. 6 of Carol Villa Commercial subdivision
> as same is recorded in the office of the Judge of Probate
> of Montgomery County, Alabama; and located at 900 East
> Boulevard South, Montgomery, Alabama 36117;

and more particularly described in Exhibit "A" attached hereto and made a part
hereof, together with all appurtenances, easements, rights and privileges there-
unto belonging including all right, title and interest of the Lessor in and to
any streets and ways adjoining said property, subject only to the zoning
ordinances and restrictions of the City of Montgomery, Alabama and easements of
record.

TO HAVE AND TO HOLD the said premises unto the Lessee, its successors
and assigns, for the term and upon the conditions and provisions herein set
forth.

2. TERM. The initial term of this lease shall be for a period of
Twenty (20) years, commencing on the 1st day of April, 1979, unless extended
or sooner terminated as hereinafter provided.

3. RENEWAL. Lessee shall have and is hereby given Four (4) separate
options to renew and extend the term hereof for Four (4) successive periods of
Five (5) years each. All such renewal terms shall be on the same terms and
conditions as herein set forth except that the rentals shall be as hereinafter
specifically provided. Unless the Lessee shall give written notice to the

Lessor not later than three (3) months prior to the expiration of the initial term or the preceding renewal term, as the case may be, of its intention not to exercise any of the same, all such renewal options shall be deemed to have been automatically exercised by the Lessee and this lease thereby renewed and extended without the execution of any other or further instrument. Lessee may, at any time during the initial or any renewal term, waive its right to not, exercise one or more of the said renewal options by notice in writing to the Lessor, which waiver shall then be binding and the term of this lease thereby extended for all purposes. As hereinafter used, all references to the term of this lease shall include such additional period or periods of time for which the same may be extended as herein provided.

4. RENTAL. Lessee shall pay and Lessor will accept as rental for the premises net rents payable monthly in advance on the first day of each month of the term hereof beginning on August 1, 1979, and payable at such place as the Lessor shall designate as follows:

(a) During the first ten (10) years, Sixteen Thousand and no/100 ($16,000.00) Dollars per annum, payable in monthly installments of One Thousand Three Hundred Thirty-three and 33/100 ($1,333.33) Dollars.

(b) During the eleventh through fifteenth years, Nineteen Thousand Two Hundred and no/100 ($19,200.00) Dollars per annum payable One Thousand Six Hundred and no/100 ($1,600.00) Dollars per month.

(c) During sixteenth through twentieth years, Twenty-one Thousand One Hundred Twenty and no/100 ($21,120.00) Dollars per annum payable One Thousand Seven Hundred Sixty and no/100 ($1,760.00) Dollars per month.

(d) During first through fourth renewal periods of five (5) years each, the rents shall be negotiable; however, rent increases, if any, for the upcoming term shall not exceed 125% of the rent for the term then ending.

5. INTENT. This is a long term ground lease vesting an estate for years in the Lessee. All buildings and improvements constructed or placed on the premises, subleases and other tenancies, licenses, and rights with respect thereto, and all other matters regarding the use and operation thereof shall be negotiated, contracted for, done and accomplished by the Lessee for its own

account, except as may be otherwise specifically provided herein. The rents hereinabove set out shall be net to the Lessor, and all costs and expenses of every kind and nature relating to the use and operation of the premises, whether or not specifically referred to herein, shall be paid by the Lessee during the term of this lease; provided that Lessee shall not pay any leasing commissions or brokerage fees on this lease and such costs, if any, shall be paid by Lessor.

6. TAXES. (a) Lessee will pay, as the same become due and before the delinquency date thereof, all taxes, water rents, sewer charges and other governmental charges and impositions of any kind levied or assessed against the premises during the term hereof by any and all taxing authorities, including ad valorem taxes, special assessments and liens for public improvements against the premises or any building or improvement located thereon; provided that all such taxes and charges shall be apportioned pro rata between Lessor and Lessee for the years in which the term of this lease commences and terminates. In the event any of said taxes or charges are payable in installments, Lessee may pay the same as such installments fall due. Lessor shall pay all special assessments made or becoming a lien against the premises prior to the commencement of the term hereof. If any special assessment made after the commencement of the term hereof shall be payable in installments, Lessee shall pay only the installments that become due and payable during the remaining term hereof. Lessee will upon request deliver to Lessor copies of receipted bills or other evidence of payment satisfactory to Lessor for all such taxes and charges. Lessor will promptly forward to Lessee, within five days after receipt thereof, any and all tax, assessment and related notices or bills that may be received by Lessor.

(b) Nothing contained in this paragraph or elsewhere in this lease shall obligate the Lessee to pay any income tax that may be imposed upon or assessed against Lessor, or any successor of Lessor, with respect to the premises or the rents and income derived from this lease, under any law now in force or hereafter enacted; nor shall Lessee be obligated to pay any inheritance, estate, succession, gift or any form of property transfer tax which may be assessed or levied against Lessor, Lessor's estate or other successor of Lessor, it being understood that Lessee's obligation to pay taxes is limited to taxes generally known as real estate taxes.

(c)  Lessee, at its sole cost and expense, shall have the right to protest or otherwise contest the amount, enforceability or legality of any tax, assessment, or other charge which it is obligated to pay, and to make application for the reduction thereof, or of any assessment upon which the same may be based.  Lessor shall, at the request of Lessee, execute or join in the execution of any instruments or documents necessary in connection with such contest or application, but Lessor shall incur no cost or obligation, thereby.  If Lessee shall make any such protest, contest or application, it will prosecute the same with reasonable diligence and continuity, and after final determination thereof will promptly pay the amount of any such tax, assessment, or charge as so determined, together with any interest, penalties and costs which may be payable in connection therewith.  Lessee shall nevertheless immediately make any payment necessary to protect the premises or any part thereof from foreclosure of any lien resulting from any tax, assessment or charge which Lessee may elect to contest as herein provided.

7.  INSURANCE.  Lessee at its expense shall take out and maintain, at all times during the term hereof, insurance protecting all buildings and improvements placed or constructed on the premises by Lessee which are of an insurable nature, against loss or damage by fire, windstorm or other casualty, under what is commonly known as a "fire and extended coverage" policy, in amounts not less than eighty (80%) percent of the full, fair insurable value thereof.  Lessee will upon request deliver to the Lessor copies of all such policies or certificates evidencing the coverage thereof, and Lessee will also upon request furnish Lessor evidence of the payment of all premiums thereon. All insurance coverage shall be placed in good and responsible companies authorized to do business in the state wherein the premises are located and acceptable to the lending institutions, if any, holding a mortgage or mortgages covering any part of the premises.

8.  REPAIRS AND ALTERATIONS.  Lessor shall not be called upon to make any repairs or improvements whatsoever during the term of this lease. Lessee shall, from time to time, at its expense, make such repairs, that as a prudent owner would make and may make at its own expense, replacements, additions, improvements, alterations, or changes as it may deem necessary or appropriate for its use of the premises.

9.  USE AND IMPROVEMENTS.  The premises may be used for any lawful purpose.  Lessee shall maintain the premises in compliance with all laws, ordinances and governmental regulations relating to the use and occupancy thereof; but Lessee, at its sole expense, may contest the application or legality of any such law, ordinance or regulation, provided that it shall protect and save harmless the Lessor from any claim or expense in connection therewith.  Lessee may from time to time during the term hereof clear, grade and otherwise prepare the premises for its intended use or uses thereof, construct or place buildings or other improvements thereon, and demolish, modify or alter any building or other structure in such manner and as often as Lessee may deem beneficial to the development and use of the premises. Lessor shall, upon request, join with Lessee in the application for any zoning change or variance or for any building or other permit required in connection with any such improvement or use, but Lessor shall incur no cost or obligation thereby.  All buildings and other improvements constructed or placed on the premises by the Lessee, including all equipment, machinery and fixtures therein or thereon, shall, notwithstanding annexation to the land, remain and be the property of Lessee until the termination of this lease and Lessee shall have the right to remove any such improvements provided Lessee be not then in default, until such termination.  Lessee, however, shall not be required to remove any such alterations, additions or improvements and Lessee's failure to do so after the termination of this Lease shall be deemed to be an abandonment thereof, whereby, the same shall be and become part of the land with title thereto vesting in the Lessor.  In case of the removal by Lessee of any improvement on the premises prior to the termination of this lease, Lessee shall remove all foundations and facilities below grade and level the area occupied by any such improvement so removed.  Lessee shall, of its sole expense, repair all damages caused by removal of Lessee's trade fixtures, machinery and equipment from buildings remaining on the premises at the termination of this lease.

10.  DAMAGE OR DESTRUCTION.  In the event any building or improvement on the premises shall be damaged by fire or other casualty for which insurance will be payable, Lessee shall repair, restore or replace the damaged or destroyed buildings or improvements with such changes in the use of the

premises or in the design, type or character of the buildings and improvements as Lessee may deem desirable; provided that the value of the replacement or new buildings and improvements shall be at least equal to that existing immediately prior to such fire or other casualty. There will be no abatement of rent during the period required for such repair, restoration or construction.

11.  INDEMNITY.  (a)  Lessee covenants that it will indemnify and save Lessor harmless from and against any and all losses, liabilities, damages, costs, expenses, suits, judgments and claims arising from injury or damage during the term hereof to person or property occasioned by any act or acts, omissions or comissions of Lessee, or of any of its agents, employees, or contractors with respect to, or growing out of, the use and occupancy of the premises, including any such liability of Lessor by virtue of its ownership of the premises.

(b)  Lessee at its expense shall take out and maintain during the term hereof a policy or policies of insurance in the form generally known as public liability coverage in good and responsible companies covering the premises with minimum limits of $100,000.00 for injury or death to one person, $500,000.00 with respect to any one occurance, and $50,000.00 for property damage.  Copies of all such policies or certificates evidencing the coverage thereof shall upon request be delivered to the Lessor, and all such policies shall contain a provision that Lessor shall be notified at least five days in advance of any cancellation or modification thereof.

12.  UTILITY BILLS.  Lessee shall pay or cause to be paid all bills for water, gas, electricity, power, light and other utilities or similar services used on or furnished to the premises during the term hereof.

13.  DEFAULT.  (a)  In the event of a default on the part of Lessee in the payment of any rents, taxes or assessments, as herein provided, and if Lessor shall execute and deliver to Lessee and each mortgagee entitled to notice, as hereinafter provided, written notice specifying such default and setting out the amount of unpaid rent, taxes or assessments claimed by Lessor to be due, as the case may be, and the default thus specified shall continue for a period of thirty (30) days from and after the date that such notice is delivered to Lessee and each mortgagee, Lessor shall have the right at its election to enter upon the premises and take immediate possession thereof (subject to the

rights of any leasehold mortgagee and subtenants as hereinafter provided, and this lease and all rights of Lessee hereunder shall thereupon terminate, without prejudice to the right of Lessor to bring suit for, and collect all rents, taxes, assessments, advances, payments or other amounts payable by Lessee which may have accrued up to the time of such entry.

(b) In the event of a default by Lessee under any of the covenants or agreements of this lease set forth to be performed or observed by Lessee other than failure to pay said rents, taxes or assessments, and if Lessor shall execute and deliver to Lessee and any mortgagee entitled to notice, as herein-after provided, written notice specifying such default in reasonable detail, then unless within ninety (90) days from and after the date that such notice is delivered to Lessee and each mortgagee, Lessee or any mortgagee shall have commenced to remove or cure such default and shall thereafter proceed with reasonable diligence to completely remove or cure such default, Lessor shall have the right at its election to exercise the right of entry and termination set forth in subparagraph (a) above; provided, however, that if the mortgagee of Lessee's interest under this lease shall in good faith and with the exercise of reasonable diligence be unable to obtain such possession of the premises by foreclosure or otherwise as will permit it to commence to cure any default covered by this subparagraph (b) within the 90-day notice period, and such mortgagee within the said 90-day period shall notify Lessor of its inability to do so, then the time within which said mortgagee may commence to cure such default shall be extended until in the exercise of good faith and with reasonable diligence such mortgagee can obtain such possession, and provided further, that during such interim the Lessee or any mortgagee shall pay or cause to be paid all rents, taxes, assessments and other amounts payable by the Lessee under the terms of this lease.

(c) If Lessee makes a general assignment for the benefit of creditors or files a voluntary petition in bankruptcy, or if a decree is entered invol-untarily adjudicating Lessee a bankrupt and such decree is not dissolved within ninety (90) days, or if a receiver shall be appointed for all the property of Lessee and shall not be discharged within ninety (90) days, then, any such action shall constitute a default by the Lessee and, subject to the notice requirements set out in subparagraph (b) above and the rights of a mortgagee

as provided in this lease, Lessor may give such notice and terminate this lease; provided, however, that no such act or event shall constitute a default hereunder or permit the termination of this lease as long as the payment of all rents and the other obligations to be performed by the Lessee shall be performed by Lessee or any party claiming under or acting on behalf of Lessee.

(d)   If the curing of any default under this lease is delayed by reason of war, civil commotion, act of God, governmental restrictions, regulations or interferences, fire or other casualty, or any circumstances beyond Lessee's or any mortgagee's control, whether similar or dissimilar to any of those enumerated (financial inability excepted), including any action or inaction of the Lessor, performance by the Lessee or any mortgagee shall be excused for the period of such delay and the time for curing any such default shall be extended for a period equivalent to such period of delay.

14.   RIGHTS OF SUBTENANTS.   In the event of a default by Lessee and a termination of this lease as herein provided, Lessor agrees that all bona fide subleases on the premises (which have been approved by Lessor) shall remain in full force and effect in accordance with their terms as a direct lease between the Lessor and each such subtenant, or, if requested by any such subtenant, Lessor shall grant to each subtenant a new lease for the balance of the term of its sublease and otherwise on the same terms and conditions as therein contained.   Such subtenants shall thereafter attorn to the Lessor, and Lessor shall be entitled to collect all rents and other amounts thereafter accruing under any such subleases provided that Lessor will perform and observe the agreements and conditions in said subleases to be performed by the landlord thereunder.   Lessor agrees to execute such futher agreements and assurances, including tri-party agreements between Lessor, Lessee and any such subtenant, as may be requested by such subtenants to assure them that their respective subleases will not be terminated in the event of default hereunder by Lessee and that same may be terminated only in the manner provided in said subleases for the landlord thereunder.

15.   QUIET ENJOYMENT.   Lessor covenants with and warrants to Lessee that Lessor has good right and full power and authority to execute this lease

and to grant the estate hereby demised, and that Lessee, upon paying the rent and performing its covenants hereunder, shall peaceably and quietly have, hold and enjoy the premises during the whole term of this lease and any extension thereof, and Lessor agrees to hold harmless and protect the Lessee and its subtenants and mortgagees under this covenant.

16. ASSIGNMENT AND SUBLEASING. Lessee may sublease the premises or any part thereof to such subtenants as Lessee, in its sole discretion, shall determine advantageous, and Lessee may assign or otherwise transfer this lease and its rights and interests hereunder. No such subleasing, assignment or transfer shall relieve Lessee of its obligations hereunder; provided, however, that Lessee's assignee that has been approved by Lessor, after five (5) years from the commencement of the initial term hereof and if such assignee shall expressly assume in writing all of Lessee's obligations hereunder and under any mortgage concerning the premises, then upon any assignment or transfer of this lease and the written approval of said assignee by the Lessor the Lessee shall be relieved of the duties, obligations and liabilities of the Lessee hereunder accruing from and after the date of such assignment or transfer. Any assignee or transferee of the Lessee or other subsequent owner of the leasehold estate may likewise be relieved from the duties and obligations of the Lessee hereunder.

17. CONDEMNATION. (a) If the whole or any part of the premises shall be taken or condemned by any competent authority for any public use or purpose, either through any proceeding or by settlement, Lessor shall be entitled to an award based on the taking of or injury to the fee simple estate in the land as covered by and subject to this lease, and Lessee shall be entitled to an award based on any loss or reduction of its leasehold estate, loss of any building or other improvement constructed or placed on the premises by Lessee, loss or interruption of business and the cost of any alterations or restoration resulting from any such taking. Any single award or settlement shall be allocated between the parties in accordance with the foregoing. As between Lessor and Lessee, a factor of eleven (11%) percent shall be used in all interest and discount computations, if any, necessary under the terms of this paragraph.

(b) If the whole of the premises be taken or if such portion thereof be taken that in the good faith judgment of the Lessee the remainder is rendered unsuitable for its purposes, then the Lessee shall be relieved of its obligation to pay the rentals and perform its other covenants hereunder from and after the date of such taking, and the Lessee shall surrender the remaining portion of the

06/10/2001 11:19 FAX 012 131 2093        GRUNER & REAL ESTATE                    ⊠013

premises, if any, to the Lessor as of such date; provided that such release and surrender shall in no way prejudice or interfere with Lessee's right to an award for its loss or damage as hereinabove provided. The rent for the last month of the Lessee's possession of the premises shall be prorated and any rentals paid in advance shall be refunded to the Lessee.

(c)  If only a portion of the premises be taken and in the good faith judgment of the Lessee, the remainder is not rendered unsuitable for its purposes, then: (i) this lease and all its provisions shall continue in full force and effect, (ii) remaining portion of the premises (including necessary grading and land preparation), with such changes in the use of the premises or in the design, type or character of the buildings and improvements as Lessee may deem desirable, to a complete unit or units of quality and value as near as possible to that existing immediately prior to such taking, except that the Lessee shall not be obligated to expend funds beyond the amount of the net condemnation award (after legal expenses) paid to the Lessee, and (iii) there shall be an abatement of rent in the proportion which the value of the land taken bears to the value of the whole of the premises, each such valuation being based on land value only and exclusive of improvements made by Lessee.

(d)  Any leasehold mortgage is a proper party in interest to any proceeding concerning a taking of all or any portion of the premises and such mortgagee shall be entitled to intervene or participate in any such proceeding either on its own behalf or on behalf of the Lessee.

18.  MORTGAGE OF LEASEHOLD.  (a) In addition to any other right herein granted, Lessee shall at all times have the right, without any consent on the part of the Lessor being required, to convey or encumber by mortgage its leasehold interest in and to the premises or any part thereof, together with its rights and interests in and to all buildings and improvements whether now existing or hereafter constructed or placed thereon, and to assign this lease or any interest therein as collateral for any such mortgage or mortgages; but any and all such conveyances, mortgages, or assignments shall be subject to this lease and the right, title and interest of the Lessor in the premises. If any such leasehold mortgage shall be foreclosed or the leasehold estate sold under any power contained therein, the leasehold mortgagee or other purchaser at such sale shall immediately succeed to all rights of the Lessee

06/20/2001 12:19 FAX 813 251 2903    SHONEY'S REAL ESTATE    ☒014

hereunder. If Lessee or any leasehold mortgagee shall notify Lessor in writing by certified or registered mail of such mortgagee's interest in the premises and shall at the same time furnish Lessor with the address to which copies of notices are to be sent to the mortgagee, Lessor will thereafter send to such mortgagee at the address so given, by certified or registered mail, a copy of any and all notices which the Lessor may from time to time give to or serve upon the Lessee under and pursuant to the terms and provisions of this lease, and no such notice to the Lessee shall be effective unless a copy thereof is also served upon the mortgagee in such manner. Such mortgagee may at its option at any time, before the rights of the Lessee shall have been forfeited to the Lessor, or within the time permitted for curing or commencing to cure defaults as herein provided, pay any of the rents due, pay any taxes, assessments, other governmental charges, or insurance premiums, make any deposits, or do any other act or thing required of the Lessee by the terms of this lease, to prevent the forfeiture hereof; and all payments so made, and all things so done and performed or caused to be done and performed by any such mortgagee shall be as effective to prevent a forfeiture of the rights of the Lessee. hereunder as the same would have been if done and performed by the Lessee. Any such mortgage so given by the Lessee may, if the Lessee so desires, be so conditioned as to provide that as between any such mortgagee and the Lessee, said mortgagee on making good and curing any such default or defaults on the part of the Lessee shall be thereby subrogated to any or all of the rights of the Lessee under the terms and provisions of this lease. A leasehold mortgagee shall not become personally liable for any of the Lessee's obligations under this lease unless and until such mortgagee becomes the owner of the leasehold estate by foreclosure, assignment in lieu of foreclosure or otherwise, and thereafter such mortgagee shall remain liable for such obligations only so long as it remains the owner of the leasehold estate. If the leasehold mortgagee should become the owner of the leasehold estate, such mortgagee may assign the lease without any consent on the part of the Lessor being required, and any purchase money mortgage delivered in connection with any such assignment shall be entitled to the benefit of all the provisions of the lease with respect to a leasehold mortgage.

06/28/2001 12:17 FAX 615 231 2858          SHONEY'S REAL ESTATE                            ☒015

(b)  In the event any such leasehold mortgage is made by Lessee and Lessor is given notice thereof as above provided, then, so long as any such leasehold mortgage remains outstanding and unsatisfied of record, no modification or amendment hereof, waiver of any right hereunder, or any surrender, acceptance of surrender or cancellation hereof by Lessee shall be of any force or effect unless approved or consented to in writing by the leasehold mortgagees; and all such acts shall be null and void if done during the term of the mortgage without such approval or consent.

(c)  If for any reason this lease should terminate in any manner before its natural expiration date while a leasehold mortgage (of which Lessor has been properly notified) shall remain outstanding and unpaid, Lessor agrees to give written notice of such termination to the leasehold mortgagee which notice shall contain a specific reference to the rights of the mortgagee under this subparagraph together with a statement of all sums then due under this lease and of all other defaults, if any, under this lease then known to Lessor.  The leasehold mortgagee, or such party as shall be designated or nominated by the mortgagee for such purposes, shall thereupon have the option to enter into a new lease of the premises with the Lessor for the remainder of the term of this lease at the same rent and upon all the other terms, conditions and agreements hereof, including any renewal or purchase rights as herein contained, provided:  (i) the leasehold mortgagee shall make written request for such new lease within thirty days after receipt of the aforementioned notice of termination from the Lessor and such request shall contain a tender or offer to pay all amounts then due to the Lessor hereunder; and (ii) at the time of execution and delivery of the new lease, the leasehold mortgagee shall pay or cause to be paid to the Lessor all amounts which are then due hereunder including the reimbursement of all costs and expenses paid or incurred by Lessor in connection with such termination or the execution of the new lease less any net income collected by the Lessor during the interim period.  Any such lease made by and between the Lessor and a leasehold mortgagee shall have and enjoy the same priority as this lease over any intervening liens and encumbrances, and all such liens and encumbrances, if any, shall be subject and subordinate thereto as fully and to the same effect as though such new lease had been dated, executed and recorded at the same time as this instrument or any short form hereof.

(d)  Lessor shall not mortgage its interest in the premises and will

not do or suffer anything to be done whereby any part of the premises may be
encumbered by a mortgage or other lien which would be prior to any mortgage
on the leasehold estate.

19. STATEMENT OF PERFORMANCE. Lessor agrees, within fifteen days
after written request (and receipt of proper notice) shall have been made
therefor, to furnish from time to time a written statement of the status of
this lease and of the Lessee's performance hereunder including a statement
that the lease is in good standing and that there is no default hereunder or,
if not, a statement setting forth the nature and particulars of any default;
and failure within said period to give such statement shall be conclusively
presumed to be a representation that the lease is in good standing without
default which statement or representation may be relied upon as being true and
correct by any prospective purchaser of Lessee's interest, mortgagee, subtenant
or other person haveing a legitimate interest in the premises.

20. LIENS. Except as may be herein specifically provided, Lessee
shall never, under any circumstances, have the power to subject the interest of
Lessor in the premises to any mechanics' or materialmen's liens or liens of any
kind.

21. RIGHTS AND REMEDIES. The rights and remedies herein given or
reserved are separate and cumulative and shall be in addition to all other
rights that may be given or provided by law, and no one right or remedy shall
operate or be deemed to exclude any other right or remedy available to the
parties hereto. Any failure of Lessor or Lessee to enforce rights or seek
remedies upon any default of the other party with respect to the obligations
of each or either of them shall not prejudice or affect the rights or remedies
of each or either of them in the event of any subsequent default, and no
waiver by either of the parties hereto of any breach of any term, covenant,
or condition shall be considered to be a waiver of any subsequent breach of
the same or any other term, covenant or condition.

22. NOTICES. Any notice required or desired to be served by either
party hereto upon the other shall be deemed to have been properly given or
made if such notice shall be in writing and shall be sent by registered or
certified mail with postage prepaid and addressed as follows:

To the Lessor at:

        Wylie P. Johnson
        R-1 B70, Robins Road
        Pike Road, Alabama 36064

To the Lessee at:

        Shoney's, Inc.
        Real Estate Department
        1727 Elm Hill Pike
        Nashville, Tennessee 37210

In the manner, either party from time to time may change the address to which notices to it are to be sent.

23. RENTALS UNDER SUBLEASES. During the term of this lease, Lessee shall have the right to collect, recieve and use for its own account and purposes all rentals due under any subleases of all or any part of the premises; provided, however, that in the event of a default hereunder by Lessee which continues unremedied after notice for the period of time as hereinabove provided, then the Lessor may notify the subtenants that it shall thereafter collect and receive such rentals. Lessee hereby authorizes and directs its subtenants, their successors and assigns, to pay such rentals to Lessor upon being notified by Lessor that it has the right to collect the same under the provisions hereof. Any rentals collected by Lessor under this paragraph shall be applied first to the expense of collecting the same, second to the payment of Lessee's obligations hereunder, and third, the balance, if any, shall be held in trust by Lessor, without interest, to discharge any future obligations of Lessee to Lessor under this lease, such trust to be terminated upon termination of this lease and any funds in said trust not required to be paid to Lessor for discharge of Lessee's obligations being thereupon retained by Lessor for its own purposes.

24. LESSOR S TITLE. (a) Lessor covenants and warrants to Lessee that Lessor has good and marketable title to the premises in fee simple absolute, and that the same are free and clear of all leases, tenancies, liens, encumbrances easements, agreements, restrictions, conditions or any other limitation whatsoever restricting the use, development, or enjoyment thereof except taxes for the current year and as specifically set forth in Article 1, page 1 herein.

(b) Within thirty (30) days from the date of this lease, Lessee may obtain, at Lessee's expense an interim title insurance binder in an amount equal to One Hundred Twenty Thousand and no/100 ($120,000.00) Dollars, issued by a

06/26/2001 12:19 FAX 615 231 2689     SHONEY'S REAL ESTATE                    Ø018

title insurance company approved by Lessee, which shall bind said company to issue a title insurance policy in the above mentioned amount, upon payment of the premium (which shall be paid by Lessee), insuring Lessee's marketable title in the leasehold estate created hereunder, that the Lessor's title is as above set out, and indicating no exceptions other than as set forth in Article 1, page 1 herein. Lessor agrees to provide Lessee within thirty (30) days of the date of this lease a boundary survey by a licensed surveyor showing the area, dimensions and location of all recorded easements against or appurtenant to the property, and the legal description of the premises. If such title binder or any survey of the premises obtained by Lessee shall disclose any defect or limitation on title or if there shall be any material variance from the size and dimensions of the premises as herein set out, Lessee shall give notice thereof to Lessor and Lessor shall promptly proceed to correct or remedy the same. If Lessor shall fail to provide such survey or if Lessor shall fail to correct or remedy such defect, limitation or variance within a reasonable time, not to exceed sixty days, Lessee at its option may terminate this lease (in which event all amounts paid Lessor by Lessee under this lease shall be repaid by Lessor) or Lessee may pursue any other remedy to which it may be entitled. In the event Lessor fails to provide the survey as set forth above, Lessee may obtain same at its cost and shall be entitled to reimbursement from Lessor either as a credit against rent or in cash payment.

(c) Lessor represents that, as of the commencement date of the term hereof, the premises will be zoned to permit the construction and operation of a restaurant. If the premises are not so zoned, Lessee may elect to terminate this lease (in which event all amounts paid Lessor by Lessee under this lease shall be repaid by Lessor) or Lessee, at its election, may treat this lease as continuing in full force and effect and grant the Lessor a reasonable time in which to obtain such zoning; provided, however, that the payment of rentals and the performance of the Lessee's other obligations hereunder shall abate until such zoning is obtained. If the Lessee shall elect to so continue this lease in effect, both Lessor and Lessee shall use their best efforts to obtain such zoning.

(d) Lessee, at its own expense, shall obtain all necessary permits, licenses, and governmental approvals for the construction and operation of the restaurant to be located on the premises. If Lessee shall be unable to obtain any and all such permits, licenses, and approvals for the construction and operation of such a facility within one hundred twenty (120) days of the date

06/26/2001 12:19 FAX 615 231 2869    SHUNEY'S REAL ESTATE    ☒019

of this lease, Lessee, at its option, may continue under this lease, or terminate this lease by written notice to the Lessor and thereupon this lease shall terminate with no further liability on either party and all amounts paid Lessor by Lessee under this lease shall be repaid by Lessor.

(8) Lessor warrants that all water, sanitary services, storm sewers, electricity, gas and other required utilities are available for connection and are at the property line.

(F) Lessee shall, within one hundred and twenty (120) days of the date of this lease, determine if the soil substrata of the premises are satisfactory, in Lessee's sole judgment, for the construction of a restaurant or such other improvement which Lessee may intend to construct on the premises. If the soil conditions are not satisfactory, Lessee may elect to terminate this lease (in which event all amounts paid Lessor by Lessee under this lease shall be repaid by Lessor) or Lessee, at its election, may treat this lease as continuing in full force and effect.

25. NON-MERGER. During the term of this lease, the leasehold estate of the Lessee shall not merge with the fee simple or other estate in the premises but shall always remain separate and distinct notwithstanding the union of all or any part of said estates either in Lessor or Lessee, or in a third party by purchase or otherwise, unless and until all persons having an interest therein, including a leasehold mortgagee, shall join in a written instrument consenting to or effecting such merger.

26. UTILITY EASEMENTS. Lessee shall have the right to grant easements over, upon and under the premises for utilities, sewers, ingress and egress, and similar purposes to service the development thereof and the improvements thereon; and Lessor agrees, from time to time upon request by Lessee, without any compensation being paid therefor, to join in the granting of such easements and to take any other action necessary to effectuate the same, all at the expense of Lessee.

27. FIXTURES. At any time prior to the termination of this lease or within thirty (30) days thereafter, Lessee may remove, or allow or cause to be removed, any and all fixtures, equipment, furniture and furnishings which may have been placed on the premises by Lessee or by any party claiming through or under Lessee, provided that Lessee shall repair or cause to be repaired any material damage resulting from such removal.

28.  PURCHASE OPTION.  Upon termination of the initial term or during any renewal term of this lease, the Lessee shall have and the Lessor grants to Lessee the exclusive right and option to purchase the premises upon the following terms and conditions:

(a) The total purchase price shall be whichever is greater $750,000.00 or the appraised value of the land only completely exclusive of the value of any buildings or other improvements thereon.  Such appraised value shall be determined as of the date of Lessee's exercise of this option by two appraisers one appointed by Lessor and one by Lessee.  If the two appraisers so appointed cannot agree on the valuation, they shall appoint a disinterested person with at least five years experience as a commercial real estate appraiser as a third appaiser.  The three appraisers then named shall act promptly to determine a valuation, and the decision of any two as to the proper valuation of such land shall be binding upon all parties hereto.  If the two appraisers cannot agree on the selection of a third appraisor, then the third appraiser shall be appointed by the president of the Nashville Real Estate Board.

(b) Lessee may exercise this option during the last three months of the initial term or during any renewal term by giving written notice of its election to Lessor by registered or certified mail addressed to Lessor at the last address of Lessor furnished for the purpose of giving notices hereunder. If mailed, the notice shall be deemed to have been given on the date of the postmark on the envelope containing such notice.  Upon the giving of such notice, a contract of purchase and sale of the premises shall be deemed to exist between the parties on the terms and conditions herein set out.

(c) Title to the premises shall be good and marketable and free and clear of all liens and encumbrances except any easements, liens or encumbrances created by the Lessee, taxes for the current year, and any sub-leases or occupancies made or suffered by Lessee.  If any title report or binder obtained by or furnished to Lessee shall disclose any defect, Lessee shall give notice of any objection to title and Lessor shall have a reasonable time (not to exceed 90 days) to cure or remove such defect.  The time for closing hereof shall be extended if necessary for such purpose.

(d) There shall be no credit of any kind on the purchase price for any of the rents paid by Lessee hereunder.  Taxes and other charges against the premises which are the obligation of the Lessee hereunder will not be prorated

and the Lessee will take title to the premises subject to the same.

(e)  The purchase and sale transaction shall be closed on a mutually agreeable business day within thirty (30) days following the exercise of this option.  Upon such closing, Lessor will deliver to Lessee a standard form of warranty deed conveying the premises in fee simple and the parties will execute such other documents as may be necessary to carry out the intent hereof.  Lessor shall furnish an up to date abstract of title or cause an owner's title insurance policy in standard form to be furnished to Lessee in the amount of the purchase price.  All recording costs shall be paid by Lessee.

29.  FIRST REFUSAL.  During the term hereof as the same may be extended, Lessor shall not sell its interest in the premises to a third party except conveyance of Lessor's interest to Lessor's heirs unless Lessee is first given the opportunity to purchase the same and declines to do so as hereinafter provided.  In the event Lessor receives a bona fide offer to purchase the premises which is acceptable to Lessor, Lessor shall give Lessee written notice of said offer stating its terms and conditions and indicating that said offer is acceptable to Lessor.  Such notice shall constitute an offer by Lessor to Lessee to sell the Lessor's interest in the premises upon the terms and conditions stated therein.  Upon receipt of such notice, Lessee shall have thirty (30) days within which to accept said offer by written notice to Lessor or to decline the same.  In the event Lessee declines the said offer, or fails to respond thereto within said thirty (30) days, Lessor shall have the right to sell its interest in the premises to the thrid party on such terms and conditions.

30.  LIMITED POWER OF ATTORNEY.  In addition to any other or similar appointment or power that may be herein made or given, Lessor does hereby nominate, appoint and constitute the Lessee to be the Lessor's true and lawful attorney in fact to act in the Lessor's name for the purpose of applying for and securing from any governmental authority having jurisdiction thereover any zoning change or variance or any building permit or other permit or license which may be necessary or desirable in connection with any proposed use or development of the premises or for any building, improvement, alteration, change or repair to be made or constructed thereon, and for the purpose of protesting and contesting in court or otherwise any tax or assessment affecting the premises or any part thereof, and for the further purpose of granting utility

06/28/2001 12:21 FAX 615 231 2889        SHONEY'S REAL ESTATE        @022

easements over, upon and under the premises for domestic service thereon, that would be valid only during the life of this lease. This appointment and grant of power to the Lessee is coupled with an interest and shall be irrevocable during the term of this lease as the same may be extended or renewed. Lessor expressly authorizes Lessee as Lessor's said attorney in fact to sign Lessor's name to any such application, protest, easement or other document required or desirable in connection therewith, Lessor hereby ratifying and affirming any and all actions done by Lessee as Lessor's said attorney in fact under the power herein granted. Nothing contained in this grant of power shall be deemed or construed to in any way limit or annul any agreement or obligation of the Lessor hereunder, and Lessor will at all times promptly execute or join in the execution of any document or writing as herein provided notwithstanding this grant of power.

31. GENERAL. (a) This instrument vests an estate for years in the Lessee. Nothing herein contained shall cause the parties to be considered as partners or joint venturers, nor shall either party be deemed to be the agent of the other except as may be herein specifically provided.

(b) As used herein, the term "mortgage" shall include deeds of trust, deeds to secure debt, financing statements, security agreements and other security instruments of a similar nature, and the term "mortgagee" shall include a beneficiary, grantee, or similar secured party under such instruments. The term "subtenant" or "sublease" shall include or apply to, as the case may be, all tenants, subtenants and licensees of the Lessee or anyone claiming by or under Lessee.

(c) Whenever either of the parties hereto (Lessor or Lessee) shall consist of more than one person or entity, then such parties shall designate one of their number or an agent as the proper party to receive notice for all, and to execute all instruments or writings that may be required or requested hereunder; and, in the case of Lessor, such multiple parties shall designate one of their number or an agent to receive the rents payable hereunder.

(d) This instrument contains the entire agreement between the parties, and the execution hereof has not been induced by any representation, promise or understanding not expressed herein. No modification, release, discharge or waiver of any provision hereof shall be of any force or effect unless in writing and signed by the party to be bound thereby.

(e)  Any holding over by the Lessee at the expiration of the original or any renewal term hereof (after having given notice of its intention not to exercise its renewal option without receiving notice from Lessor to vacate the premises) shall in the absence of an agreement to the contrary, create a tenancy from month to month at the last rent then payable and otherwise on all the same terms and conditions hereof.

(f)  Except as may be herein specifically provided, this lease and all of the covenants, conditions, terms and agreements herein contained shall bind and inure to the benefit of the Lessor and the Lessee and their respective heirs, legal representatives, successors and assigns.  As used herein, the singular number shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders unless the context shall fairly require a different construction.

(g)  This lease shall be construed under the laws of the state wherein the premises are located.

(h)  Upon the request of the other, either party hereto will at any time join in an execution of a short form lease in proper form for recording and setting forth the existence and term of this lease and any other provisions contained herein deemed appropriate for inclusion in such memorandum by the party making such request.  Notwithstanding the foregoing, Lessor or Lessee may at any time record or file this entire lease.

IN WITNESS WHEREOF, this lease has been duly executed by the parties hereto as of the day and year first above written.

LESSOR:

_Wylie P. Johnson_
Wylie P. Johnson

WITNESS:

_Lurene H. Johnson_
Lurene H. Johnson

_____

_____

LESSEE:

Shoney's, Inc.

By: _____
As It's Vice President

Attest:

By: _____
As It's Secretary

06/28/2001 12:23 FAX 615 231 2080          SHONEY'S REAL ESTATE          Ø025

STATE OF TENNESSEE        )
                          :  SS.
COUNTY OF DAVIDSON        )

I, *May L Hale*, a Notary Public, in and for said State and County, hereby certify that H.S. Tidwell and Jess S. Shearin, whose names as Vice President and Secretary of Shoney's, Inc., a Tennessee Corporation, are signed to the foregoing conveyance, and who are known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, they, as officers and with full authority, executed the same voluntarily for me and as the act of said corporation.

Given under my hand and official seal this the __13__ day of __April__, 1979.

*May L Hale*
Notary Public

My Commission Expires: *May 13, 1979*

SHUREY'S REAL ESTATE

STATE OF TENNESSEE       )

                         :  SS.

COUNTY OF DAVIDSON       )

I, _Palmer Smith Lehman_ , a Notary Public
in and for said State and County, hereby certify that Wylie P.
Johnson and Lurene H. Johnson, whose names are signed to the fore-
going conveyance and who are known to me, acknowledged before me
on this day that, being informed of the contents of the conveyance,
Wylie P. Johnson and Lurene H. Johnson, executed the same voluntarily
on the day the same bears date.

Given under my hand and official seal this _17th_ day of
_April_ , 1979.

_Palmer Smith Lehman_
                    Notary Public
My Commission Expires: _January 4, 1981_

06/28/2001 12:24 FAX 615 231 2080    SHONEY'S REAL ESTATE    @021



02/20/2002 11:52 FAX 615 231 2889    SHONEY'S REAL ESTATE    ☒004



**SHONEY'S**
Inc.

1727 Elm Hill Pike • Nashville, TN 37210 • (615) 381-5201

December 22, 1998

Certified/Return Receipt Requested

Mr. Wylie P. Johnson
621 Royal Tower Drive
Birmingham, AL  35209-6856

Re: Shoney's #1270
    805 Eastern Bypass
    Montgomery, AL

Dear Mr. Johnson:

Pursuant to paragraph "3. Renewal" of the Lease dated April 13, 1979, between yourself and Lucene H. Johnson, Lessor and Shoney's, Inc., Lessee, this letter shall serve as written notice that Shoney's, Inc. is hereby exercising the first of four, five year renewal options. The renewal will become effective April 1, 1999. The rent, per our telephone conversation, will increase at that time to $26,400 per year, which is a 12% increase.

Please sign below and return one copy of this letter to my attention indicating your receipt of this notice to renew.

Sincerely,                                   *Wylie Pierson Johnson*
                                            Wylie P. Johnson

*Susann Shearon*                            31 December 1998
Susann B. Shearon                           Date
Director of Property Management

cc:    Jeff Gordon
       Kaye Couch

---

**SENDER:**
• Complete items 1 and/or 2 for additional services.
• Complete items 3, 4a, and 4b.
• Print your name and address on the reverse of this form so that we can return this card to you.
• Attach this form to the front of the mailpiece, or on the back if space does not permit.
• Write "Return Receipt Requested" on the mailpiece below the article number.
• The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):

1. ☐ Addressee's Address
2. ☐ Restricted Delivery

Consult postmaster for fee.

3. Article Addressed to:

Wylie P. Johnson
621 Royal Tower Dr.
Birmingham AL 35209-6856

4a. Article Number  P 372 164 251

4b. Service Type
☐ Registered          ☒ Certified
☐ Express Mail        ☐ Insured
☐ Return Receipt for Merchandise ☐ COD

7. Date of Delivery

5. Received By: (Print Name)

6. Signature: (Addressee or Agent)
*Wylie P. Johnson*

8. Addressee's Address (Only if requested and fee is paid)

*Ia you* RETURN ADDRESS completed on the reverse side?

Thank you for using Return Receipt Service.

, CUSTOMER, EVERY DAY!

**Exhibit B**

**Lessor's Consent**

G:\Closed Stores\Alabama\1270-Eastern Bypass-Montgomery\K5- Assignment February 18 2002.DOC

10/31/2004  18:07    3052958185                                    PAGE  01

4 - 1 8 -  05

FROM  ANDY  THEO

TO.  D. MATTHEW  COBLENTZ

AT.  MC CLINTON & COMPANY



## McCLINTON & COMPANY, INC.



COMMERCIAL REAL ESTATE

•

DEVELOPMENT

MANAGEMENT

BROKERAGE

2777 ZELDA ROAD

MONTGOMERY, AL 36106

334/270-9653

FAX 334/270-9811

www.mcclintonco.com

**PROPOSAL TO SUB-LEASE**
**Former Shobey's Building**
**805 Eastern Blvd.**
**Montgomery, Alabama**
**April 6, 2005**

| | |
|---|---|
| **LANDLORD:** | MAC EAST, L.L.C. |
| **TENANT:** | City Café Diners, or entity to be satisfactory to Landlord. Lease will be personally guaranteed by Jimmy Tselios for initial 5 Lease Years. |
| **GUARANTOR:** | Jimmy Tselios to provide personal guaranty |
| **USE:** | Restaurant |
| **SQUARE FOOTAGE:** | Approximately 4,550 Square Feet |
| **TERM:** | Approximately 8 Lease Years to expire on March 30, 2014 (1 day prior to expiration of Ground Lease term) |
| **RENEWAL OPTIONS:** | One 5-year renewal option to extend lease (ends March 30, 2019) Two additional 5-year renewal options will automatically be made available only if Landlord purchases pursuant to Ground Lease as provided below |
| **MINIMUM ANNUAL RENT:** | Rental increases based on five-year increments<br><br>-Lease Years 1-5 $77,350.00 (per annum)<br>-Lease Years 6-10 $84,175.00 (per annum)<br>-Lease Years 11-13 $88,725.00 (per annum)  Final term will expire on March 31, 2019, simultaneous with Ground Lease, unless extended by purchase of Ground Lease as provided below |
| **ANNUAL % RENTAL:** | 6%  over breakpoint of $2,300,000 Annually |
| **OPERATING COSTS, TAXES & INSURANCE:** | Tenant directly responsible for all costs and expenses relating to the use and operation of the property and improvements, including taxes and insurance. |
| **TAXES:** | Estimated at $1.20 psf. ($5,460 per annum) |
| **INSURANCE:** | Estimated at $.43 psf.($1,956.50 per annum non-liquor) |
| **CONDITION OF SPACE:** | Landlord will provide building in as-in  broom swept clean condition, plus the following:  a) repair any existing roof leaks b) replace any interior damaged ceiling tiles, c) provide inspection, and repair if necessary, of HVAC system with 90-day warranty to Tenant, d) make minor repairs and patch the parking lot and seal coat |
| **RENT COMMENCEMENT:** | 120 days from delivery of premises to Tenant |
| **DELIVERY:** | 30 days from Executed Lease. |

-1-

**PURCHASE OPTION:**

Landlord has the right under the Ground Lease to purchase the Fee Simple estate (ground) from the current owner at a price of the greater of $750,000 or the appraised value of the property. In the event Landlord elects to purchase the ground, then Landlord will automatically make available to Tenant two more additional 5-year renewal options. Those option rents will be $22.00 psf ($100,100 per annum) for Lease Years 14-18 and $23.50 psf ($106,925 per annum) for years 19-23. If after 5 lease years in the term, Tenant notifies Landlord it wishes to purchase the land and building and upon payment of $200,000 Earnest Money deposit (non-refundable, to be credited to purchase price), Landlord will exercise its Purchase Option under the Ground Lease and with simultaneous closing:
1) Landlord will sell the ground to Tenant at Landlord's cost as set forth in the Ground Lease, plus closing costs for purchase of Fee Simple, plus $100,000 fee paid to Landlord for exercising the option.
2) Landlord will sell the building and improvements at the then fair market value as determined by an independent appraisal, less credit for the amount of Leasehold Improvements made by Tenant and substantiated with appropriate documentation, but in no event less than the appraised value as of 8/14/01 of $342,000.

**GROUND LEASE:**

That certain Lease agreement dated April 13, 1979 by and between Wylie P. Johnson and wife, Lurene H. Johnson and MAC East, LLC., successor in interest by assignment from Shoney's Inc. (copy attached)

**ASSIGNMENT AND ASSUMPTION OF LEASE:**

That certain Assignment and Assumption of Lease dated February 20, 2002 by and between Shoney's, Inc. and MAC East, LLC (copy attached)

**CONTINGENCIES:**

The offer to lease as contemplated herein is subject to the provisions of the original Ground Lease and Assignment and Assumption of Lease, and may require the approval of third parties under those agreements

**OWNERSHIP OF IMPROVEMENTS:**

Leasehold Improvements, including but not limited to, all plumbing, lighting, electrical, heating, cooling and ventilating fixtures and equipment, or other articles of personal property used in the operation of the property (as distinguished from operations incident to the business of Assignee) will become the property of Landlord upon expiration or termination of the Lease agreement.

This proposal is not intended to create any legal rights or obligations, but rather to summarize the basic business terms of a proposed lease agreed upon to date. All of the legal rights and obligations of the parties will be set forth in the lease agreement and no such rights or obligations shall take effect unless or until the lease agreement has been fully executed by both Tenant and Landlord. Until the lease agreement is fully executed by both parties, the Landlord reserves the right to negotiate with other parties concerning the leasing of this space.

-2-

If you have not already done so, would you please furnish us with Financial Statements for the entity which will be executing the lease and/or guaranteeing the lease. These financial statements must be received and reviewed and approved by landlord and its lender prior to execution by landlord of the lease.

**[SIGNATURE PAGE FOLLOWS]**

The Proposal to Sub-Lease dated April 6, 2005 for the location known as 805 East Boulevard, Montgomery, Alabama as set forth above is accepted by Tenant this _LP_ day of _APRIL_, 2005 as the basic provisions agreed to for the preparation of the proposed lease agreement.

City Café Diner

By: _____

-3-

STATE OF ALABAMA                    )
                                   :
COUNTY OF MONTGOMERY               )

## Sub LEASE AGREEMENT

This Lease Agreement ("Lease") is made and entered into on this _____ day of May, 2005, by and between Mac East, LLC, an Alabama limited liability company ("Landlord") and PAM Enterprises, Inc d/b/a City Cafe Diner, a _____ ("Tenant").

### WITNESSETH:

In consideration of the mutual covenants and promises herein contained, and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Landlord and Tenant agree as follows:

1.     PREMISES. Landlord does hereby demise and lease unto Tenant and Tenant does hereby rent and lease from Landlord, subject to all of the terms, conditions and provisions hereof, that certain property known generally as 805 Eastern Boulevard, Montgomery, Alabama, including the land legally described on Exhibit "A" attached hereto ("Property"), and the existing building located thereon ("Building") (hereinafter the Building and the Property are referred to as the "Premises"). The Premises is leased subject to any and all easements and other encumbrances which may now or hereafter affect the Property.

2.     GROUND LEASE. Notwithstanding anything contained herein to the contrary, Tenant understands and agrees that the Premises is leased to Tenant subject to the terms and conditions of that certain Lease dated April 13, 1979 ("Ground Lease"), by and between Wylie P. Johnson and wife, Lurene H. Johnson, ("Ground Lessor"), and Shoney's, Inc., a Tennessee corporation ("Ground Lessee"), which interest of Ground Lessee in and to the Ground Lease was assigned to Landlord by virtue of that certain Assignment and Assumption of Lease dated February 20, 2002, by and between Ground Lessee, as Assignor, and Landlord, as Assignee, which is recorded in the Office of the Judge of Probate of Montgomery County, Alabama, in Real Property Book 2374, at Page 612 ("Ground Lease Assignment"). Tenant understands that this Lease is a "sublease" of the Premises by Landlord to Tenant and is subject to all the terms and conditions of the Ground Lease and the Ground Lease Assignment. Tenant covenants and agrees with Landlord to observe and perform all, and not to violate any, of the covenants, agreements and obligations assumed by Landlord, as Tenant under the Ground Lease and as Assignee under the Ground Lease Assignment (except with regard to the payment of rent due the Ground Lessor which shall be remitted by Landlord, and except with respect to insurance and taxes which are addressed in this Lease), and in the event of any conflict between the terms and conditions of this Lease and the terms and conditions of the Ground Lease and the Ground Lease Assignment ("Underlying Documents"), the terms and conditions of the Underlying Documents shall govern. As used herein, the term "Underlying Parties" shall mean and refer to Ground Lessor and Ground Lessee. A copy of the Underlying Documents is attached hereto as Exhibit "C."

3.    TERM.

(a)    Primary Term.  The primary term of the Lease ("Primary Term") shall commence on the Effective Date and end at midnight on March 30, 2014.  As used herein, the term "Rent Commencement Date" shall mean the earlier of (i) the date on which Tenant shall open to the public the business operation to be conducted by Tenant on the Premises, or (ii) the date that is one hundred twenty (120) days after the Effective Date of this Lease.

(b)    First Extension Term; Possible Extension Terms.

(i)    Tenant shall have one (1) option to extend the term of this Lease for an additional five (5) years for such extension (i.e., beginning March 31, 2014 and ending at midnight on March 30, 2019, such five-year extension period being referred to as "First Extension Term") on the same terms and conditions as the Primary Term, except as hereinafter provided.  In order to exercise its option to extend the Lease for the First Extension Term, this Lease must otherwise be in full force and effect, Tenant must not be in Default hereunder (either at the time of giving such notice to extend or during the period between the giving of such notice and the end of the term then in effect) and Tenant shall give to Landlord written notice of its election to extend the term at least six (6) months prior to the expiration of the Primary Term.  Time shall be of the essence, and the failure to meet said conditions and to give notice of such election on or before such period of time shall render the right to extend for the First Extension Term null and void.

(ii)    If, but only if, Landlord exercises its right to purchase the Premises pursuant to the terms of the Ground Lease, then in addition to the First Extension Term, Tenant shall automatically be allowed two (2) consecutive options to extend the term of this Lease for an additional five (5) years for each such extension (each such five-year extension period being referred to as "Possible Extension Term") on the same terms and conditions as the First Extension Term, except as hereinafter provided.  In order to exercise its option to extend the Lease for the next available Possible Extension Term, this Lease must otherwise be in full force and effect, Landlord shall have acquired the Premises pursuant to a right to purchase the Premises set forth in the Ground Lease (although Landlord shall have no obligation whatsoever to Tenant to exercise its right to acquire the Premises or to acquire the Premises under any circumstance, it being Landlord's sole and exclusive election and decision whether to acquire the Premises, and in the event Landlord does not so purchase the Premises, Tenant shall not have any rights to any Possible Extension Term), Tenant must not be in Default hereunder (either at the time of giving such notice to extend or during the period between the giving of such notice and the end of the term then in effect) and Tenant shall give to Landlord written notice of its election to extend the term at least six (6) months prior to the expiration of the First Extension Term.  Time shall be of the essence, and failure to meet said conditions and to give notice of such election on or before such period of time shall render the right to extend for the first or second Possible Extension Term, as the case may be, null and void.  As used herein "Term" shall mean the Primary Term, the First Extension Term provided herein, if and to the extent exercised by Tenant in accordance with the terms hereof, and each Possible Extension Term, if the right to so exercise exists in favor of Tenant and if and to the extent exercised by Tenant in accordance with the terms hereof.



2

(c)     Termination.  This Lease shall terminate on the last day of the Term, without the necessity of any notice from either Landlord or Tenant to terminate the same, and Tenant hereby waives notice to vacate or quit the Premises, as the same is required of Landlord by the Underlying Documents.  Tenant agrees that Landlord shall be entitled to the benefit of all provisions of law respecting the summary recovery of possession of the Premises from a tenant holding over to the same extent as if statutory notice had been given.  Tenant hereby agrees that if it fails to surrender the Premises at the end of the Term, Tenant will be liable to Landlord for any and all damages which Landlord shall suffer by reason thereof and Tenant shall indemnify Landlord against all claims and demands made by the Underlying Parties and any succeeding tenants against Landlord, founded upon delay by Landlord in delivering possession of the Premises to the Underlying Parties and/or any succeeding tenant, as a result of Tenant's failure to surrender the Premises as aforesaid.

(d)     Holding Over.  If Tenant shall be in possession of the Premises after the expiration of the Term, as specified hereinabove, in the absence of any written agreement between Landlord and Tenant extending the Term hereof, then and in such event, the Landlord and Tenant agree in addition to and not in limitation of Tenant's liability for Landlord's damages sustained as a result of the holdover (as provided in Paragraph 3(c)), the tenancy under this Lease shall become a tenancy-at-will at a monthly rental equal to twice the sum of the monthly annual guaranteed rental and all other rental payable by Tenant to Landlord during the last month of the Term.  Tenant shall also pay all other charges payable under the terms of this Lease, prorated for each month during which Tenant remains in possession.  Such tenancy-at-will shall be subject to all other conditions, provisions and obligations of this Lease, except that during the period of any such holding over, Tenant shall not have the right to exercise any right to extend the Lease as provided hereunder.  Tenant shall not interpose any counterclaim or counterclaims in a summary proceeding or other action based on holdover.  Landlord's acceptance of any rental after the termination of this Lease shall not constitute a waiver by Landlord of any of its rights under this Lease and shall not constitute an acknowledgement or agreement by Landlord that the Term of this Lease has been extended.

4.     USE.

(a)     Permitted Use.  The Premises shall be used and occupied by Tenant only for the operation of a restaurant operating under the trade name "City Café Diner" ("Permitted Use") and not otherwise, without the prior written consent of Landlord and, if required by the terms of the Underlying Documents, the Underlying Parties.  Tenant agrees to open at the Premises on the Rent Commencement Date for the Permitted Use and, thereafter, to continuously operate same at all times during the Term for the Permitted Use.  Tenant shall have no claim against Landlord for any damages or right to terminate this Lease should Tenant's use and occupancy of the Premises for the purposes set forth in this Lease be prohibited or substantially impaired by reason of any law, ordinance or regulation of federal, state, county or municipal governments or by reason of any act of any legal or governmental or other public authority.

(b)     Operations By Tenant.  In regard to the use and occupancy of the Premises, Tenant shall at its expense during the Term: (i) keep the inside and outside of all glass in the doors and windows of the Premises clean; (ii) keep all exterior surfaces of the Building clean and all areas of

3

the Premises located outside the Building in a clean, sightly and first-class condition; (iii) replace promptly any cracked or broken glass of the Building with glass of like grade and quality; (iv) maintain the Premises in a clean, orderly and sanitary condition and free of insects, rodents, vermin and other pests; (v) keep all mechanical apparatus free of vibration and noise which may be transmitted beyond the Building; (vi) comply with all laws, ordinances, rules and regulations of governmental authorities and all recommendations of Landlord's fire insurance rating organization now or hereafter in effect; (vii) conduct its business in all respects in a dignified manner and in accordance with high standards of a restaurant operation; and (viii) observe and perform all of the obligations imposed on Landlord by virtue of the Underlying Documents in connection with the use and operation of the Premises.

5.    RENTAL.

(a)    Annual Guaranteed Rental. Tenant agrees to pay to Landlord, without previous notice or demand therefore and without deduction, set off or abatement, annual guaranteed rental during each Lease Year (as hereinafter defined) of the Term for the Premises as follows:

Primary Term:                    05 thru 3-30-11

(a)    During the first five (5) Lease Years, Seventy-Seven Thousand Three Hundred Fifty and No/100 Dollars ($77,350.00) per Lease Year; and

(b)    During Lease Years 6 thru 8, both inclusive, Eighty-Four Thousand One Hundred Seventy-Five and No/100 Dollars ($84,175.00) per Lease Year.    3-31-1 thru 3-30

First Extension Term (if exercised as herein provided):

(a)    During Lease Years 1 and 2, both inclusive, Eighty-Four Thousand One Hundred Seventy-Five and No/100 Dollars ($84,175.00) per Lease Year; and    3-31-11 3-30-16

(b)    During Lease Years 3 thru 5, both inclusive, Eighty-Eight Thousand Seven Hundred Twenty-Five and No/100 Dollars ($88,725.00) per Lease Year.    3-31-16 3-30-18

First Possible Extension Term (if exercised as herein provided):

(a)    One Hundred Thousand One Hundred and No/100 Dollars ($100,100.00) per Lease Year.

Second Possible Extension Term (if exercised as herein provided:

(a)    One Hundred Six Thousand Nine Hundred Twenty-Five and No/100 Dollars ($106,925.00) per Lease Year.

4

As used herein, the term "Lease Year" shall mean each twelve (12) month period beginning March 31 and ending the next following March 30, except that the first "Lease Year" shall begin on the Rent Commencement Date and end on March 30, 2007. The annual guaranteed rental during the first Lease Year shall be appropriately increased based upon the number of days that the first Lease Year exceeds 365 days. The annual guaranteed rental shall be payable in advance in equal monthly installments due on the first day of each consecutive calendar month, beginning on the Rent Commencement Date, and shall be made by Tenant to Landlord at the address herein stated or at such other address or addresses of which notice is given pursuant to Paragraph 18 of this Lease. In the event that the Rent Commencement Date is other than the first day of a calendar month, then the rent for the month in which the Rent Commencement Date commences shall be due on the Rent Commencement Date and prorated for such month.

(b)     Percentage Rent. As additional rent hereunder, Tenant shall pay to Landlord for each Lease Year during the term of this Lease an amount equal to six percent (6%) of Gross Receipts (hereinafter defined) in excess of Two Million Three Hundred Thousand and No/100 Dollars ($2,300,000.00) ("Break Point") annually, such additional rent to be determined as provided in this Paragraph 5(b) ("Percentage Rent"). In the event that any Lease Year is more or less than 365 days, the Break Point shall be adjusted upward or downward on a prorata basis based on the number of calendar days in the Lease Year, based on a 365-day calendar year.

The term "Gross Receipts" shall mean the aggregate amount of all sales (whether for cash, on credit, by gift certificate or otherwise) of food, beverages, goods, articles and any other merchandise, and the aggregate of all charges for services performed (whether for cash, on credit or otherwise) made and rendered in, about or in connection with the Premises by Tenant and its assignees, sublessees and licensees, including off-premises sales and monies derived at or away from the Premises so long as they are in connection with the business operation conducted on the Premises, plus the aggregate amount of all receipts by Tenant with respect to all sales made or performed by means of mechanical or electronic games or devices, but shall not include any federal, state, municipal or other sales, value added or retailer's excise taxes attributable to such period in question which are paid by Tenant and separately charged to and collected from customers, receipts from sales to employees or complimentary sales, condemnation proceeds, proceeds of insurance policies received by Tenant, bulk and/or intercompany transfers of food and/or inventory, provided no such transfer is made to avoid liability for Percentage Rent, or proceeds from the sale of used restaurant equipment.

Within ten (10) days after the end of each month, Tenant shall deliver to Landlord a written statement setting forth the amount of Tenant's Gross Receipts for the preceding month. Percentage Rent shall be determined and paid along with the monthly reports on a monthly basis commencing when Tenant's Gross Sales first exceed the Break Point during the Lease Year with respect to Gross Sales transacted during such period.

Tenant shall maintain and preserve, or cause to be maintained and preserved at the principal office of Tenant in accordance with the generally accepted accounting practices for the type of business conducted by Tenant on the Premises, full, complete, accurate and detailed books, records and accounts of its daily Gross Receipts, both for cash and on credit, derived from

MAY-23-2005-MON 08:57 AM                                              P. 009

the business operation conducted on the Premises. Landlord or its agents may inspect any and all records in Tenant's possession which relate to Gross Receipts from the Premises at Tenant's principal business office at any time during normal business hours and normal working days upon prior reasonable notice. Such examination shall be conducted in a manner which will not interfere unreasonably with the business conducted at Tenant's principal office. Landlord may cause an audit of the Gross Receipts from the business operation conducted by Tenant on the Premises to be made, and if the written statement of Gross Receipts previously delivered to Landlord shall be found to be inaccurate, Landlord and Tenant shall make appropriate adjustments so that Landlord shall receive the full Percentage Rent to which it is entitled. Landlord shall pay for the cost of such audit unless the audit shall disclose Gross Receipts of three percent (3%) or more in excess of the Gross Receipts theretofore reported by Tenant for that particular Lease Year, in which case Tenant shall promptly pay to Landlord the reasonable cost of said audit. In addition, if there is any deficiency in Percentage Rent, Tenant shall promptly pay same.

(c)    Additional Rent. In addition to annual guaranteed rental and percentage rental, all other payments by Tenant to Landlord, including, but not limited to, taxes and insurance, shall be deemed to be and shall become "additional rent" hereunder whether or not the same be designated as such and shall be due and payable on demand; and Landlord shall have the same remedies for failure to pay same as for a nonpayment of guaranteed rental (guaranteed rental and additional rent are hereinafter sometimes collectively referred to as "Rent"). It is the intention of the parties that this Lease is an absolute net Lease. Tenant shall pay all Rent and all other charges due under this Lease without notice or demand and free from any charges, impositions, claims, damages, expenses, deductions, setoffs, counterclaims, abatement, suspension or defense of any kind, and Rent and all other charges payable by Tenant shall continue to be payable in all events, and the obligations of Tenant shall continue unaffected unless the requirement to pay or perform the same shall have been terminated or modified pursuant to an express provision of this Lease.

(d)    Place of Payment. All payments of Rent shall be made to Landlord as the same shall become due in lawful money of the United States of America at the address specified in Paragraph 18 of this Lease, or to such other party or at such other address as hereinafter may be designated by Landlord by written notice delivered to Tenant at least ten (10) days prior to the next ensuing monthly rental payment date.

(e)    Partial Payments. Any payment by Tenant or acceptance by Landlord of a lesser amount than shall be due from Tenant to Landlord shall be treated as a payment on account and shall not be treated as an accord and satisfaction. The acceptance by Landlord of a check for a lesser amount with an endorsement or statement thereon or upon any letter accompanying such check that such lesser amount is payment in full shall be given no effect, and Landlord may accept such check without prejudice to any other rights or remedies which Landlord may then or thereafter have against Tenant.

(f)    Late Charges. In the event any monetary obligation, including but not limited to Rent, by Tenant is not paid within ten (10) days after the due date, Tenant shall pay to Landlord a

late fee equal to five (5%) percent of the delinquent payment. The imposition of such late·charge shall be in addition to the rights given Landlord in the event of Tenant's default hereunder.

6.     ORDINANCES, REGULATIONS AND ZONING.

(a)     General. Tenant shall not use or occupy or permit the Premises to be used or occupied in any unlawful manner or for any illegal purpose or in such manner as to constitute a nuisance or for any use in contravention of the terms of this Lease or the Underlying Documents. Tenant shall at its sole cost and expense comply with (i) all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations and ordinances affecting the Premises or any part thereof, or the use thereof, including but not limited to, those which require the making of any structural, unforeseen or extraordinary changes, whether or not any such statutes, laws, rules, orders, regulations or ordinances which may be hereafter enacted involve a change of policy on the part of the governmental body enacting the same, and (ii) all directions, rules, orders and regulations of the fire marshal, health officer, building inspector, other appropriate officers of governmental agencies having jurisdiction over the Premises, and the National Board of Fire Underwriters, the National Fire Protection Association, the National Electrical Code, the American Society of Heating and Air Conditioning Engineers, all carriers of insurance on the Premises, any Board of Underwriters, rating bureau and similar bodies, the Landlord's fire insurance rating organization and any and all other bodies exercising similar functions in connection with the prevention of fire or the correction of hazardous conditions which apply to the Premises or to the Tenant's use and occupancy thereof. Tenant shall hold the Landlord harmless from penalties, fines, costs or damages which are occasioned by and result from Tenant's use and occupancy of the Premises or any of Tenant's covenants expressed herein.

(b)     Environmental Matters and Hazardous Substances. As used in this Paragraph 6(b), the term "Applicable Environmental Law" shall be defined as any statutory law, rule, regulation or case law pertaining to health or the environment or petroleum products or radon radiation or oil or hazardous substances or solid wastes, including without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) as codified at 42 U.S.C.§ 9601, et seq. (1982) [and applicable state statutes]; the terms "hazardous substance" and "release" shall have the meaning specified in CERCLA, provided, in the event CERCLA is amended to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment, and provided, to the extent that the laws of the State of Alabama establish a meaning for "hazardous substance" or "release" which is broader than that specified in CERCLA, such broader meaning shall apply. Tenant represents and warrants that the Premises and Tenant shall not be, from the date hereof, in violation of or subject to any existing, pending or threatened investigation or inquiry by any governmental authority or any response costs or remedial obligations under any Applicable Environmental Law and this representation and warranty would continue to be true and correct following disclosure to the applicable governmental authorities of all relevant facts, conditions and circumstances, if any, pertaining to the Premises; that Tenant has not obtained and is not required to obtain any permits, licenses or similar authorizations to construct, occupy, operate or use any buildings, improvements, fixtures or equipment forming a part of the Premises by reason of any Applicable Environmental Law; that Tenant has taken or will conduct tests necessary to determine that no petroleum products, oil,

7

hazardous substances, or solid wastes have been disposed of, located in, or otherwise released from the Premises; and that the use which Tenant has made, makes or intends to make of the Premises will not result in the location, disposal, or other release of any petroleum products, oil, hazardous substances, or solid wastes on or to the Premises. Tenant hereby agrees to pay any fines, charges, fees, expenses, damages, losses, liabilities, and response costs arising from or pertaining to the application of any such Applicable Environmental Law to the Premises. Tenant further agrees to indemnify and forever save Landlord harmless from any and all judgments, fines, charges, fees, expenses, damages, losses, liabilities, response costs, and attorneys' fees and expenses arising from the application of any such Applicable Environmental Law to the Tenant, the Premises, or Landlord; and this indemnity shall survive the Term of this Lease or foreclosure of this Premises or the taking of a deed in lieu of foreclosure. Tenant agrees to notify Landlord in the event that any governmental agency or other entity notifies Tenant that it may not be in compliance with any Applicable Environmental Law. Tenant agrees to permit Landlord to have access to the Premises at all reasonable times in order to conduct, at Tenant's expense, any tests which Landlord deems are necessary to ensure that Tenant and the Premises are in compliance with all Applicable Environmental Laws. Nothing contained herein should be construed to require Tenant to be responsible for any conditions existing prior to Tenant's occupancy unless Tenant performs work on the Premises which may require compliance with Applicable Environmental Laws or if Tenant's use and occupancy requires compliance with any Applicable Environmental Laws.

(c)    Americans with Disabilities Act:  Tenant hereby acknowledges that the Americans with Disabilities Act of 1990 (the "ADA") as contained in 42 U.S.C. § 12101, et seq., now governs various public accommodations, including buildings for access by the physically or mentally disabled. The Tenant hereby agrees that it will comply in all respects, and as required by law, with the ADA, to the extent of application of the ADA to the Tenant, the Premises and the Building. All such work performed pursuant to this paragraph will be made at the sole cost and expense of the Tenant. Tenant acknowledges and agrees that Landlord is not responsible for any compliance in regard to the ADA, and Tenant specifically indemnifies, holds Landlord harmless and assumes the obligation for the same.

7.    ALTERATIONS AND TRADE FIXTURES.  Tenant shall not have the right to make any alterations, additions or improvements to the Premises or any portion of the Building without the prior written consent of Landlord and, to the extent required by the terms of the Underlying Documents, the Underlying Parties. However, as a condition of giving such consent, Landlord may require review and approval (for Landlord's sole benefit) of any plans and specifications relating to such alterations, additions or improvements. Any alterations, additions, and improvements made in accordance with the terms of this Lease shall be done and performed in a good and workmanlike manner and shall remain, from the time of construction and installation, the property of the Landlord. No such alteration by Tenant permitted herein shall violate any lawful rule or regulation, plat or zoning restriction or other law, or ordinance or regulation applicable thereto or the terms of the Underlying Documents. Tenant shall not permit any liens to attach to the Premises and shall pay all costs for and save the Landlord harmless on account of any claims of mechanics, materialmen or any liens in connection with any such alterations, additions or improvements. Tenant shall have the right to place on the Premises Tenant's trade fixtures, movable furniture and equipment for use by Tenant in accordance with the terms of this Lease and

8

the Underlying Documents. Any such trade fixtures, movable furniture and equipment of Tenant shall at all times remain the property and possession of Tenant. Tenant shall have the right to move, remove, replace or repair its movable furniture placed upon the Premises by Tenant, provided such act is in the ordinary course of business and Tenant's covenant as to the condition of the Premises shall apply on account thereof.

8.    REPAIRS AND MAINTENANCE.

(a)    Tenant shall accept the Premises "as is" (but in a broom-swept condition), and, except as provided in (b) below, Landlord shall have no obligation to repair, maintain, alter, replace or modify the Premises or any part thereof, or any plumbing, heating, electrical, air conditioning or other mechanical installation therein or serving same. Tenant agrees not to permit any waste to the Premises and Tenant shall at all times maintain the Premises and shall keep the Premises free from all dirt and other refuse matter, and shall make and perform any and all repairs and maintenance to the Premises to keep the Premises in a "first class" state of repair and operating condition. Notwithstanding anything contained in this Lease to the contrary, it is understood that Tenant shall be solely responsible for and shall keep and maintain in a good, clean condition all areas of the Property located outside of the Building, including the parking areas, shrubbery, and walkways. Tenant shall use only reputable firms or persons and shall allow no liens for labor or materials to attach to the Premises by virtue of the covenant herein to make repairs and to maintain the Premises. Tenant shall maintain the Premises at all times in a safe condition. Tenant shall keep the Premises during the Term in as good a state of repair as when delivered to Tenant, ordinary wear and tear excepted, and, at the expiration of the Term, shall deliver the Premises to Landlord in the same good condition and state of repair as when delivered to Tenant, ordinary wear and tear excepted. The maintenance and repair of the Premises to be performed by Tenant shall include, without limitation, all heating and air conditioning units serving the Building, maintenance and repair of all areas on the Property outside the Building, including but not limited to parking areas, trash/dumpster areas, sidewalks, grass and landscaped areas. Tenant agrees at its expense to maintain on a regular basis throughout the Term a pest, vermin or other extermination program for the Premises and shall upon Landlord's request, furnish evidence of such program. During the Term, Tenant agrees to perform normal and routine grass-cutting and shrub maintenance to those areas on the Premises that exist outside the Building.

(b)    Notwithstanding the provisions of Paragraph 8(a) above, (i) on or before thirty (30) days after the Effective Date, Landlord shall at its expense (i) repair any existing roof leaks, (ii) replace any interior damaged ceiling tiles, (iii) cause an inspection, and repair, if necessary, the HVAC system and provide a ninety (90) day warranty on same to Tenant, and (iv) make minor repairs and patch the parking lot and seal coat.

9.    TAXES AND SPECIAL ASSESSMENTS. Landlord agrees to pay ad valorem taxes and assessments attributable to the Premises during the Term of this Lease ("Ad Valorem Taxes"). Tenant agrees to pay to Landlord, as additional rent, the full amount of all Ad Valorem Taxes, including any related costs or expenses, imposed, charged or levied against the Premises during the Term within fifteen (15) days after receipt from Landlord of a copy of the relevant tax

9

MAY-23-2005-MON 08:58 AM                                                          P. 013

statement from the taxing authority. Ad Valorem Taxes during the first and last years of the Term shall be equitably prorated between Landlord and Tenant.

Tenant shall be responsible for and shall pay all taxes and assessments levied and assessed against, or which become due and payable with respect to, Tenant's personal property and fixtures which may be on the Premises during the Term. Furthermore, Tenant shall pay any and all taxes and assessments attributable to this Lease or Tenant's occupancy of the Premises during the Term. The taxes payable by Tenant also include, but are not limited to, any tax on real estate rental receipts or gross receipts of Tenant or any other tax imposed upon owners of real estate as such, rather than upon persons generally. Tenant shall pay any and all such taxes and assessments hereunder required to be paid by Tenant at least fifteen (15) days before the last day on which such tax or assessment may be paid without incurring any interest or penalty, and upon such payment Tenant shall immediately furnish to Landlord receipts or other evidence demonstrating payment thereof. At Landlord's option, Landlord shall have the right, but not the obligation, to pay any taxes required to be paid by Tenant herein and, in such event, Tenant shall reimburse Landlord on account thereof within fifteen (15) days after Landlord notifies Tenant of such payment and requests reimbursement therefor. In no event shall Tenant be liable for or be required to pay any income, profit, excise, inheritance, estate, gift or franchise taxes of Landlord.

10.   UTILITIES, DEBRIS REMOVAL, ETC. Tenant shall provide and pay any and all utilities, including water, fuel and electricity, telephone service, and garbage. Tenant shall allow no liens to attach to the Premises on account thereof and shall indemnify Landlord and save Landlord harmless on account thereof. It is the understanding that Landlord shall not have any responsibility to do same. Tenant shall satisfy itself as to the adequacy of all utilities to serve the Premises. Landlord shall not be liable for any permanent or temporary interruption or termination of utility services nor shall any of Tenant's obligations under this Lease be affected by any such interruption or termination of utility services.

11.   SIGNS. All signs that Tenant desires to install on the exterior of the Building or located on the Premises outside the Building shall be expressly conditioned on Landlord's written prior approval and subject to Tenant obtaining all required and/or necessary consents and approvals of governmental and administrative authorities and any approvals required by the terms of the Underlying Documents. Tenant agrees to maintain all signs in good condition and state of repair, to save Landlord harmless from any loss, cost or damage as a result of the erection, maintenance, existence or removal of the same, and shall repair any damage which may have been caused by the erection, existence, maintenance or removal of such signs. At the end of the Term, Tenant shall have the right to remove signage on the Building and the Property installed by Tenant that identifies Tenant's business, but Tenant shall repair any damage as a result of such removal.

12.   INSPECTION. Tenant agrees to permit Landlord or Landlord's agents to inspect or examine the Premises at any reasonable times and to permit Landlord to make such repairs to the Premises which Landlord may deem desirable or necessary for its safety or preservation, and which Tenant has not covenanted herein to do or has failed to do following thirty (30) days' written notice (except that no notice shall be required from Landlord to Tenant in an emergency). Such permission as is granted hereby to Landlord shall not be deemed to require Landlord to do any act

unless specifically provided for in this Lease. Inspection shall also be permitted as required by the terms of the Underlying Documents.

13.   INDEMNIFICATION.   Tenant agrees to indemnify Landlord and save Landlord and the Underlying Parties harmless from all suits, actions, damages, liability and expense in connection with loss of life, bodily or personal injury or property damage (and each and all of them) arising from or out of any occurrence in, upon, or from the Premises or resulting from or attributable to the occupancy or use by Tenant of the Premises. Tenant shall store its property in, and shall occupy, the Premises at its own risk and releases Landlord and the Underlying Parties, to the fullest extent permitted by law, from all claims of every kind resulting in loss of life, personal or bodily injury or property damage, no matter when or where or to whom same occurs without being limited by any other provision of this Lease.

Landlord and the Underlying Parties shall not be responsible or liable to Tenant or to any other person or persons for any loss or damage to either the person or property of Tenant or to any other person or persons. Landlord and the Underlying Parties shall not be responsible for any injury, loss or damage to any person or to any property of Tenant or any other person caused by or resulting from bursting, breakage or from leakage, steam, or snow or ice, running, backing up, seepage, or the overflow of water or sewage in any part of said Premises or for any injury or damage caused by or resulting from Acts of God or the elements, or for any injury or damage caused by or resulting from any defect or negligence in the occupancy, construction, operation or use of any of the Premises. Nothing herein contained shall be construed to indemnify Landlord or the Underlying Parties against, or to release Landlord or the Underlying Parties from, the negligence and wanton conduct by Landlord or the Underlying Parties or from Landlord's or the Underlying Parties' own intentional or wrongful acts. If any proceeding is brought against Landlord or the Underlying Parties by reason of any such claim enumerated herein, the Tenant, upon notice from Landlord, covenants to resist or defend such action or proceeding by counsel reasonably satisfactory to Landlord. Tenant will provide and insure in its public liability policies required herein, not only its own liability in respective matters therein mentioned, but also the liability herein assumed.

14.   INSURANCE.

(a)   Landlord's Insurance.   Landlord agrees at all times during the Term to pay all premiums for any fire, casualty, liability and rental abatement insurance carried by Landlord with respect to the Premises. Tenant shall pay to Landlord, as additional rent, the cost of all insurance so maintained by Landlord within fifteen (15) days after receipt of an invoice.

(b)   Tenant's Insurance.

(i)   Tenant agrees and covenants to provide and keep in force such general comprehensive public liability and property damage insurance including contractual liability coverage insuring against tort liabilities assumed under this Lease and liquor liability insurance coverage with limits of not less than Two Million and No/100 Dollars ($2,000,000.00) for injury or

death for any one accident, such insurance to insure Landlord, Tenant, the Underlying Parties and, if requested, Landlord's mortgagee against such liability.

(ii)    At all times during the Term, Tenant shall pay all premiums for and maintain in effect insurance covering all fixtures, furniture, equipment and other items of Tenant's personalty in the Premises to the extent of eighty percent (80%) of the insurable value of the same against all casualties included in the classification "Fire and Extended Coverage, Vandalism and Malicious Mischief."

(iii)    Tenant shall subscribe to the workers' compensation law of Alabama and shall maintain (at its sole cost and expense) workers' compensation and employers' liability insurance covering all of its employees as required of a subscriber to the relevant statutes in Alabama, in the amount of not less than Five Hundred Thousand and No/100 Dollars ($500,000.00) in respect of loss or damage to property, in the amount of not less than Five Hundred Thousand and No/100 Dollars ($500,000.00) per disease, and in the amount of not less than Five Hundred Thousand and No/100 Dollars ($500,000.00) per disease aggregate.

(iv)    Tenant hereby covenants that no policy to be provided by it under (i) above shall be subject to cancellation or modification except after thirty (30) days prior written notice to Landlord and any mortgagee of the Premises, and each policy shall so provide.  All policies evidencing the insurance required shall be taken out and maintained in generally recognized, responsible insurance companies, qualified under the laws of the State of Alabama to assume the respective risks undertaken and shall be subject to Landlord's approval.  All certificates of insurance required shall be deposited with the Landlord, who, in turn, may deposit such policies with the Underlying Parties any mortgagee of the Premises.  At least thirty (30) days prior to the expiration of any such policy, Tenant will furnish to Landlord evidence reasonably satisfactory to Landlord that such policy has been renewed or replaced by another policy.  If Tenant shall fail to maintain any insurance required herein, Landlord shall have the right, but not the obligation, to cause such insurance to be effectuated and, if such insurance shall be effectuated by Landlord, Tenant shall immediately reimburse Landlord all premiums incurred by Landlord.

15.    DAMAGE OR LOSS OF PROPERTY.  In the event that the Premises shall be damaged by fire or other casualty, either Landlord or Tenant may, at its option to be exercised within thirty (30) days after such damage or destruction, elect to terminate the Lease, in which event the Lease shall be deemed terminated effective as of the date of such damage or destruction, unless subsequent to such damage or destruction Tenant conducted its business on the Premises, in which event the Lease shall be deemed terminated as of the date of the notice of such termination. All insurance proceeds payable on account of such damage or destruction shall be payable to and belong solely to Landlord.  Tenant's obligation to pay Rent shall be adjusted on a prorated basis based on the extent of such fire or casualty; and if Landlord elects to restore, when such damage is restored by Landlord, full Rent shall commence.

Landlord shall not be liable for any loss of any property of Tenant or property of others in the possession or under the control of Tenant, occurring on or near the Premises; or for any damages to or from any property of Tenant, however occurring, including but not limited to that

12

resulting from the negligent act or omission of Landlord. Tenant agrees that all insurance which it is to maintain shall contain at all times a waiver of the right of subrogation against the Landlord. Landlord, without liability to Tenant, shall have the right and may at any time close the said Premises whenever the same may become necessary in compliance with any law, order, regulation or direction of any lawful authority or the agents, officers or representatives thereof.

16.    CONDEMNATION. If more than fifteen percent (15%) of the Building shall be acquired or condemned by eminent domain or taken under threat of eminent domain, whether voluntary or not, for any public or quasi public use or purpose, and such acquisition or condemnation renders the Building unfit for the purpose for which they are leased herein, then and in that event this Lease shall terminate; such termination to be effective from the date of effective taking, or of title vesting in such proceeding, whichever shall first occur, and neither party shall have any claim against the other for the value of the unexpired term of said Lease. In the event of any such condemnation or taking, any proceeds attributable to such taking, including leasehold and reversion, shall belong solely to Landlord without any deduction therefrom for any present or future estate of Tenant and Tenant waives and assigns to Landlord all its right, title and interest in such award. In the event of any taking of the Building which does not permit a cancellation of this Lease, then the provisions of this Lease shall remain in full force and effect.

17.    SUBORDINATION. Landlord and Tenant agree that, as to any mortgage or mortgages which are presently upon or which may be placed upon the Premises after the date hereof, this Lease shall be subordinate; provided, however, that the mortgagee of any such mortgage shall agree that the Tenant's leasehold interest hereunder shall not be foreclosed in any action brought under such mortgage if at the time of the bringing of an action to foreclose or thereafter, the Tenant shall not be in default in the payment of rental or in the performance of other obligations under this Lease. Notwithstanding the foregoing, if such mortgagee shall foreclose on Landlord's interest, then such mortgagee shall have all rights of Landlord as if it were an original Landlord under this Lease and Tenant shall attorn to such mortgagee without the need for any further evidence thereof. Tenant agrees, upon demand, without costs, to execute any instrument as may be necessary to effectuate such subordination, which instruments shall include, among other provisions required by the mortgagee, an agreement on the part of the Tenant to attorn to any and all of Landlord's successors in interest to the Premises resulting from any foreclosure of any such mortgage or conveyance in lieu of the foreclosure.

18.    NOTICES. All notices or demands given or required to be given hereunder shall be in writing and, if to Landlord, sent by United States certified mail, postage prepaid, or recognized overnight courier, addressed to the Landlord at: MAC East, LLC, Attn: J.D. "Buddy" McClinton, 2777 Zelda Road, Montgomery, Alabama 36106; and, if to the Tenant, sent by United States certified mail, postage prepaid, or recognized overnight courier addressed to the Tenant at: City Café Diner, Attn: Andy Theodorakis, 337 Highland Lake Circle, Decatur, Georgia 30033; provided that either party by like written notice may designate any different addresses to which subsequent notices shall be sent.

13

19.   QUIET ENJOYMENT.  Landlord agrees that, upon Tenant's compliance with and subject to the terms and conditions of this Lease, Tenant shall and may peaceably and quietly have, hold and enjoy the Premises for the Term of this Lease herein provided.

20.   SURRENDER.  At the expiration of said term or the extension thereof, Tenant will quit and surrender the Premises hereby leased in as good state and condition as when delivered to Landlord, ordinary wear and tear excepted and in accordance with the requirements of the Underlying Documents.  Any holding over by the Tenant shall not operate, except by written agreement, to extend or renew this Lease and no tenancy or any duration shall be created thereby.

21.   ASSIGNMENT OR SUBLETTING.  Tenant shall not, without the prior written consent of Landlord and the Underlying Parties, (a) assign this Lease or any interest hereunder, (b) permit any assignment hereof by operation of law, (c) sublet the Premises or any part thereof, or (d) permit the use of the Premises by any parties other than Tenant, its agents and employees.  With respect to any assignment or subletting proposed by Tenant, Landlord shall have the right to require that the Premises, if assignment is proposed, or that part of the Premises to be included in a subletting, be surrendered to the Landlord for the balance of the Term, as respects a proposed assignment, or for the term of the sublease, in consideration of the cancellation of, in the event of an assignment, or an appropriate pro rata adjustment of, the Tenant's obligations hereunder.  If Landlord does not elect the surrender provided above and Landlord and the Underlying Parties give their written consent to an assignment or subletting, then, in addition to any other requirements of Landlord, the following requirements shall apply:  (a) the assignee or sublessee shall assume in writing the obligation to Landlord to faithfully perform all the terms and covenants and to comply with all the conditions of this Lease, (b) Tenant of this Lease shall, notwithstanding the assignment or sublease, continue to be directly obligated to Landlord for the payment of the Rent herein reserved and for the full performance of the terms and covenants of this Lease, and (c) any excess Rent payable by the assignee or sublessee, as the case may be, shall belong and be payable solely to Landlord.  In the event Landlord consents to any transfer of Tenant's interest in this Lease, the word "Tenant" shall thereafter be deemed to also include, without further reference, the party to whom such interest is transferred.  The consent by Landlord to any assignment or subletting in any one instance or more shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting.  Receipt by Landlord of Rent due hereunder from any party other than Tenant named herein shall not be deemed to act as a consent to any such assignment or subletting nor relieve Tenant of its obligations hereunder.  Any attempted assignment or subletting in violation of this Lease shall be null and void.

22.   SUCCESSORS AND ASSIGNS.  Subject to the provisions of Paragraph 21 hereof, this Lease and the covenants and conditions herein contained shall inure to the benefit of and be binding upon Landlord, its successors and assigns, and shall be binding upon Tenant, its permitted successors and assigns and shall inure to the benefit of Tenant and only such assigns of Tenant to whom the assignment by Tenant has been consented to by Landlord by the terms of this Lease.

14

23.    EVENTS OF DEFAULT AND LANDLORD'S REMEDIES.

(a)    Events of Default.  The following shall be Events of Default and the terms "Event of Default" or "Default" shall mean, whenever they are used in this Lease, any one or more of the following events:

(i)    Failure by Tenant to pay the Rent or any other charges provided herein after the same become due and payable and the continued failure to pay such for ten (10) days or more after Landlord gives Tenant notice of such failure (provided, however, if any such notice is given twice by Landlord during the Term, then the ten (10) day notice shall not be required for any other nonpayment of Rent in any such twelve (12) month period).

(ii)    Failure by Tenant to perform or observe any agreement or covenant undertaken by Tenant contained in this Lease (except for events specified in provisions (iii), (iv) and (v) below), which failure shall have continued for a period of fifteen (15) days after written notice shall have been given to Tenant by Landlord specifying, in reasonable detail, the nature of such failure and requiring the Tenant to perform or observe the agreement or covenant with respect to which Tenant is delinquent.

(iii)    The filing by Tenant of a voluntary petition in bankruptcy, or Tenant's failure to lift, within thirty (30) days, any execution, garnishment or attachment of a size as seriously to impair its ability to discharge its obligations hereunder; the commission by Tenant of any act of bankruptcy or Tenant's adjudication as a bankrupt; an assignment by Tenant for the benefit of creditors or the entry by Tenant into an agreement of compromise with creditors.

(iv)    The Premises becomes abandoned or vacant during the Term of this Lease, or Tenant ceases to conduct normal business operations at the Premises for more than one hundred twenty (120) days.

(v)    Tenant's failure to purchase the Premises after exercise by Tenant of its option to purchase pursuant to Paragraph 37 of this Lease.

(b)    Remedies on Default.  Whenever any such Event of Default shall have occurred and be continuing, the Landlord may take any one or more of the following steps:

(i)    Landlord may re-enter and take possession of the Premises, exclude the Tenant from possession thereof and rent the same for and on account of the Tenant, holding Tenant liable for the deficiency due thereunder; or

(ii)    Landlord may terminate this Lease, exclude the Tenant from possession of the Premises and lease the same for and on account of Landlord, continuing to hold Tenant liable for all deficiency due hereunder; or

15

(iii)    Landlord may declare all payments of annual guaranteed rent, additional rent or of any other monies due or to become due from Tenant during the Term immediately due and payable in full; or

(iv)    Landlord may take whatever other action at law or in equity may appear necessary or desirable to collect the Rent then due or to enforce any obligation, covenant or agreement of Tenant under this Lease.

In connection with Landlord's exercise of any of its remedies above, Landlord may also repair or alter the Premises in such manner as Landlord may deem necessary or advisable, and/or let or re-let the Premises and any and all parts thereof for the whole or any part of the remainder of the Term, in Landlord's name, or as the agent of Tenant, and, out of any rent so collected or received, Landlord shall (first) pay to itself the expense and cost or retaking, repossessing, repairing and/or altering the Premises up to $100,000.00, and the expense of removing all persons and property therefrom; and (second) pay to itself any cost or expense sustained in securing any new tenant or tenants; and (third) if Landlord shall have declared all payments hereunder immediately due and payable in full as provided in this Paragraph, pay to itself any balance remaining on account of Tenant's liability to Landlord for such accelerated payments; provided, however, that nothing herein shall be interpreted as prohibiting Landlord from proceeding against Tenant for the full amount of such accelerated payments, less amount collected by Landlord from any replacement tenant or tenants and not applied to expenses incurred to prepare the Premises for occupancy by any replacement tenant or tenants, immediately upon the declaration thereof.  Any entry or re-entry by Landlord, whether had or taken under summary proceedings or otherwise, shall not absolve or discharge Tenant from liability hereunder.

(c)    Landlord's Performance Upon Tenant's Default.    If Tenant should default hereunder, Landlord may, in addition to the other remedies provided herein, perform the act constituting the default for and on account of Tenant.  Tenant hereby authorizes Landlord to come upon the Premises to perform such act and while on the Premises to do any act which Landlord deems proper to accomplish the correction of such default.  If the default by Tenant is the payment of any sum of money or if Landlord incurs any expense, including reasonable attorney's fees, whether for payment of any sum or for instituting, prosecuting or defending any action or proceeding instituted by reason of any default of Tenant, any such expenditure made by Landlord including interest, costs and damages shall be deemed additional rental and together with interest at the rate of twelve percent (12%) per annum shall be due and payable to Landlord on the first day of the month following the incurring of such respective expense.

(d)    No Remedy Exclusive.    No remedy herein conferred upon or reserved to Landlord is intended to be exclusive for any other available remedy or remedies, but each and every remedy shall be cumulative and shall be in addition to every other remedy given under this Lease or now or hereafter existing at law, in equity or by statute.  No delay or omission to exercise any right or power accruing upon default shall impair any such right or power or shall be construed to be waiver thereof, but any such right or power may be exercised from time to time as often as may be deemed expedient.  In order to entitle the Landlord to exercise any remedy reserved to it under this section, it shall not be necessary to give any notice, other than such notice as herein expressly required.

16

(e)    Agreement to Pay Attorney's Fees.  In the event that as a result of a default or threatened default by Tenant or Landlord hereunder, Landlord or Tenant should employ attorneys-at-law or incur other expenses in and about the collection of Rent or the enforcement of any other obligation, covenant, agreement, term or condition of this Lease, the prevailing party shall be entitled to reimbursement for counsel fees and other expenses reasonably and actually incurred.

24.    EXHIBITING PREMISES.  It is agreed that Landlord and/or Landlord's Agent may display a sign on the Premises during the last ninety (90) days of the Term offering the Premises for sale or for lease, and may exhibit the Premises for such purpose at reasonable hours during said period.  Said sign shall not unreasonably block the visibility of Tenant's signage on the Premises.

25.    IDENTITY OF INTEREST.  The execution of this Lease or the performance of any act pursuant to the provisions hereof shall not be deemed or construed to have the effect of creating between Landlord and Tenant the relationship of principal and agent, of a partnership or of a joint venture, but the relationship between them shall be and remain only that of Landlord and Tenant.

26.    NO PERSONAL LIABILITY.    Anything in this Lease to the contrary notwithstanding, Tenant agrees that it shall look solely to the estate and property of the Landlord in the Premises (subject to prior rights of the Underlying Parties and any mortgagees of the Premises) for the collection of any judgment (or other judicial process) requiring the payment of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed and/or performed by Landlord, and no other property or assets of the Landlord shall be subject to levy, execution or other procedures for the satisfaction of Tenant's remedies.

27.    ENTIRE AGREEMENT.  This Lease with any exhibits and riders attached hereto contains the entire agreement of the parties and no representations, inducements, promises or agreements, oral or otherwise, not embodied herein, shall be of any force or effect.

28.    MARGINAL HEADINGS.  The marginal headings or notes are inserted for convenience only and are not to be construed as part of this Lease.

29.    ESTOPPEL CERTIFICATE.  Upon written request by Landlord, Tenant shall deliver a letter or other agreement as may be requested by Landlord, stating whether this Lease is in full force and effect, and setting forth the date of commencement of the Term and Rent, prepayment or offset of Rent, any defaults or violations of the Lease, and any obligations that have not been fulfilled by both parties hereto.

30.    SEVERABILITY.  Any provision or provisions of this Lease which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions hereof shall nevertheless remain in full force and effect.

31.    TRANSFER OF TITLE.  In the event Landlord transfers this Lease, except as collateral security for a loan, upon such transfer Landlord will be released from all covenants,

17

conditions, agreements, liabilities and obligations hereunder from and after the date of such transfer or conveyance; it being intended hereby that the covenants, agreements and conditions contained herein to be performed by Landlord shall, subject as aforesaid, be binding on the named parties as Landlord hereunder, their heirs and assigns, only during their respective successive periods of ownership.

32.    EFFECTIVE DATE.  The "Effective Date" of this Lease shall be the date that appears on the first page of this Lease.

33.    BROKERS.  Landlord and Tenant acknowledge that the only brokers involved in this transaction is McClinton & Company, Inc. ("Landlord's Broker"), for which Landlord shall pay a commission to Landlord's Broker.  Each party agrees to hold the other harmless from any commission which may be claimed on account of this Lease.

Pursuant to § 34-27-8(c), Code of Alabama, 1975, as amended, the following Agency Disclosure is given:

AGENCY DISCLOSURE:

The listing company, McClinton & Company, Inc., is:

___X__  An agent of the Landlord.
_____  An agent of the Tenant.
_____  An agent of both the Landlord and the Tenant and is acting as a limited consensual
        dual agent.
_____  Assisting the _____ Landlord _____ Tenant as a transaction broker.

The selling company, _____N/A_____, is:

_____  An agent of the Landlord.
_____  An agent of the Tenant.
_____  An agent of both the Landlord and the Tenant and is acting as a limited consensual
        dual agent.
_____  Assisting the _____ Landlord _____ Tenant as a transaction broker.

Landlord(s) initials: _____          Tenant(s) initials: _____

All of the parties to this Lease understand, acknowledge and agree that one or more real estate brokers, salespersons and/or companies who are licensed under the Alabama Real Estate License Law (the "Licensees"), and/or one or more members of his, her or their immediate family or other individuals, organizations or business entities in which one or more said Licensees may have a personal interest may constitute or own a direct or indirect interest in the Landlord. Additionally, one or more of said Licensees may also own a direct or indirect interest in and/or serves as an officer, director, agent, servant or employee of the Leasing Agent.  This disclosure is made solely for the purpose of disclosing the related party interest of a real estate licensee or his or

18

her other related parties in connection with this Lease. Nothing herein shall be construed to make any such Licensee or other related parties a party to this Lease or to impose any direct or indirect obligations or liabilities on such Licensee or other related parties in connection with this real estate transaction. All parties to this Lease acknowledge and agree that they have received timely disclosure of said related party interests.

34.    **NOTICE TO MORTGAGEE.** So long as there is of record a mortgage of Landlord's interest in the Premises, and Tenant has been given written notice of the identity and address of such mortgagee, no notice provided for herein to Landlord shall be deemed to have been given unless a copy thereof is given to such mortgagee at the same time and in the same manner as the original was given to the other party to this Lease. Tenant agrees that if in any notice to Landlord the performance of some act is required or compliance with some provision required, and Landlord does not, within the allotted time, perform such act or comply with such provision the Tenant will so notify the mortgagee and mortgagee shall have sixty (60) days after receipt of such notice in which to perform such act or comply with such provision for and on behalf of Landlord, and Tenant shall have no right to terminate this Lease if the mortgagee shall perform and comply within the time herein provided. If the act or thing to be performed must be accomplished within sixty (60) days, then mortgagee shall be deemed to have complied herewith in the event it commenced the performance or compliance within said sixty (60) day period and thereafter completes the same with due diligence. The granting to the mortgagee of additional time in which to comply shall not be deemed in any manner to release or relieve Landlord from the obligations of Landlord under this Lease. The said mortgagee is hereby authorized to enter upon the Premises and while on the Premises to do anything necessary to correct such default.

35.    **COUNTERPARTS.** This Lease may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, and all of which taken together shall constitute but one and the same instrument.

36.    **GUARANTEE OF LEASE.** As an inducement to Landlord to enter into this Lease, Jimmy Tselios is simultaneously executing and delivering a personal guaranty in favor of Landlord in the form attached hereto as Exhibit "B."

37.    **TENANT'S OPTION TO PURCHASE.** Provided there has been no Event of Default by Tenant hereunder and this Lease is in full force and effect, within sixty (60) days immediately following the end of the fifth Lease Year of the Primary Term, Tenant shall have the option to purchase the Premises under the following terms and conditions:

(a)    In order to purchase the Premises, Tenant shall give written notice to Landlord of the exercise of the option within sixty (60) days immediately following the end of the fifth (5th) Lease Year of the Primary Term. Simultaneously with notice of the exercise of the option, and as a condition to the valid exercise of the option to purchase by Tenant, Tenant shall remit to Landlord the payment of Two Hundred Thousand and No/100 Dollars ($200,000.00), as earnest money, which shall be non-refundable to Tenant but shall be applied against the purchase price upon closing. In the event of Tenant's failure to consummate the purchase of the Premises as herein required, after exercise of the option to purchase, the earnest money shall become the sole property

19

of Landlord and shall not be applied against Rent or any other obligation of Tenant under this Lease. Time shall be of the essence with respect to the giving of Tenant's notice and the payment of the earnest money and Tenant's failure to give such notice and pay the earnest money as herein required shall render its option to purchase hereunder null and void and of no further force and effect.

(b)    The purchase price to be paid by Tenant to Landlord for the Premises shall be the sum of the following: (i) an amount equal to the sum of (aa) the Landlord's cost to purchase the Premises as set forth in the Ground Lease, (bb) closing costs for Landlord's purchase of fee simple title in and to the Premises from the Ground Lessor, and (cc) One Hundred Thousand and No/100 Dollars ($100,000.00) as a fee paid to Landlord for exercising the option; plus (ii) the then fair market value of the building and improvements as determined by an independent appraisal, with the appraiser selected by Landlord, less credit for the amount of leasehold improvements made by Tenant and substantiated with appropriate documentation, but in no event shall the amount in (ii) be less than the appraised value as of August 14, 2001 of Three Hundred Forty-Two Thousand and No/100 Dollars ($342,000.00).

(c)    At closing, Landlord shall convey the Premises to Tenant by statutory warranty deed subject to ad valorem taxes and assessments, covenants, restrictions, reservations and easements, if any, affecting the Premises, matters of survey, rights of parties in possession, and municipal zoning ordinances. Tenant's exercise of the option shall be deemed to constitute conclusively Tenant's acceptance of matters affecting title to the Premises. Closing shall occur at the office of Landlord's attorney as designated by Landlord on the date specified by Landlord that is concurrent and simultaneous with Landlord's acquisition of the Premises pursuant to the Ground Lease. Landlord may desire to effectuate a sale of the Premises as part of a tax-free exchange (§ 1031 or otherwise), and Tenant agrees to cooperate with Landlord and to execute any such documents as may be reasonably necessary or required in order to enable Landlord to so consummate the sale pursuant to a tax-free exchange. Tenant shall pay to Landlord the purchase price at closing in immediately available funds without any adjustment for taxes and without any other cost and expense being deducted from the proceeds otherwise due Landlord for the purchase price of the Premises. The Lease shall be cancelled by the parties exercising a mutual cancellation and release delivered at the time of closing with the delivery of the deed and delivery of the purchase price payable under the provisions of this Paragraph 37. Failure of Tenant to consummate the sale after exercise of the option shall be deemed an Event of Default under Paragraph 23 of this Lease. Landlord and Tenant acknowledge and agree that no brokers or persons entitled to a brokerage fee or commission or similar compensation have been involved in connection with the transaction contemplated in this Paragraph 37 and each agrees to indemnify and hold the other harmless from and against any and all claims for fees and commissions claimed by any other broker or person as a result of such party's contact or agreement with said broker or person.

(d)    Notwithstanding anything contained herein to the contrary, the option to purchase is specific to the named Tenant herein and shall not be transferable or assignable to any third party.

IN WITNESS WHEREOF, the Landlord and the Tenant have caused this Lease to be executed on its behalf, effective as of the date first hereinabove stated.

**LANDLORD:**

**Mac East, LLC,**
an Alabama limited liability company

By:_____
   Its:_____

**TENANT:**

**City Café Diners,**
a_____

By:_____
   Its:_____

[ACKNOWLEDGEMENT BEGINS NEXT PAGE]

21

MAY-23-2005-MON 09:01 AM                                                    P. 025

STATE OF ALABAMA                    )
                                    :
COUNTY OF MONTGOMERY                )

     I, the undersigned, a Notary Public in and for said County in said State, hereby certify that _____, whose name as _____ of Mac East, LLC, an Alabama limited liability company, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such _____ and with full authority, executed the same voluntarily for and as the act of said limited liability company.

     Given under my hand and official seal this _____ day of May, 2005.


(SEAL)                              _____
                                    Notary Public
                                    My commission expires:



[ADD CITY CAFÉ DINERS ACKNOWLEDGEMENT]


22

**Exhibit "A"**

(Legal Description of Property)

Lot "G," according to the Map of Carol Villa Commercial Subdivision Plat No. 6, as said Map appears of record in the Office of the Judge of Probate of Montgomery County, Alabama, in Plat Book 29, at Page 125.

MAY-23-2005-MON 09:02 AM  NOM-0003-2-1VM                                          P. 027

Exhibit "B"

STATE OF ALABAMA          )
                          :
COUNTY OF MONTGOMERY      )

## GUARANTY OF LEASE

THIS GUARANTY OF LEASE (hereinafter "Guaranty") is made as of this _____ day of May, 2005, by **Jimmy Tselios**, whose address is _____ (hereinafter "Guarantor").

## RECITALS

(A)    Simultaneously herewith, **Mac East, LLC**, an Alabama limited liability company ("Landlord"), and **City Café Diners**, a _____ company ("Tenant") have entered into a Lease Agreement dated the _____ day of May, 2005 (the "Lease").

(B)    As an inducement to Landlord to enter into and execute the Lease, the Guarantor has executed this Guaranty and agreed among other things to guarantee and perform all the obligations of Tenant under the Lease.

## AGREEMENT

NOW, THEREFORE, in consideration of Landlord's entering into and executing the Lease with Tenant, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Guarantor, the Guarantor does hereby covenant and agree with Landlord as follows:

1.    Guaranty Obligation.  Guarantor does hereby unconditionally guarantee to the Landlord the due and punctual payment of all Rent and other amounts payable, as well as the full, prompt and complete performance by the Tenant of all and singular the covenants, obligations, agreements, conditions and provisions in the Lease contained on the part of the Tenant therein to be kept, observed and performed, thru the end of the fifth (5th) Lease Year (as defined and determined in the Lease) with no less force and effect than if the undersigned was named as Tenant in said Lease, and the Guarantor will forthwith on demand pay all amounts at any time in arrears, and will make good any and all defaults of Tenant occurring under said Lease thru the end of the fifth (5th) Lease Year.

2.    Enforcement.

(a)    This Guaranty shall be absolute, continuing, unlimited, unconditional and irrevocable and the Landlord shall not be first required to enforce against the Tenant, or any other person, any liability, obligation or duty guaranteed hereby before seeking payment or enforcement thereof against the Guarantor.  The Landlord shall have the right to demand payment or performance by the Guarantor upon default by the Tenant without first giving notice of default or opportunity to cure to the Guarantor.  Suit may be brought and maintained against

the Guarantor by the Landlord to enforce any liability, obligation or duty guaranteed hereby without joinder of the Tenant or any other person.

        (b)    This Guaranty and the liability of the undersigned hereunder shall in no way be impaired or affected by an assignment which may be made of said Lease, or any subletting thereunder, or by any extension(s) of the payment of any rental or any other sums provided to be paid by Tenant, or by any forbearance or delay in enforcing any of the terms, conditions, covenants or provisions of the Lease or by any amendment, modification or revisions of the Lease, but to the contrary, this Guaranty shall remain in full force and effect. Furthermore, notwithstanding anything contained herein to the contrary, the term "Lease", as used herein, shall include without limitation any amendment, modification or revision to the Lease Agreement set forth in (A) of the Recitals.

    3.    Waiver.   Guarantor hereby waives diligence, presentment, protest, notice of dishonor, demand for payment, extension of time of payment, notice of acceptance of this Guaranty, notice of nonpayment at maturity, and indulgences and notices of every kind, and hereby consents to any and all forbearance and extensions of the time of payment of any amounts due under the Lease and to any and all changes in the terms, covenants and conditions of the Lease hereafter made or granted and to any and all substitutions, exchanges or releases of all or any part of the collateral therefor, it being the intention hereof that Guarantor shall remain liable hereunder until all amounts due under the Lease shall have been fully paid and the terms, covenants and conditions thereof shall have been fully performed and observed, notwithstanding any act, omission or thing which might otherwise operate as a legal or equitable discharge of Guarantor.

    4.    Subrogation.   Guarantor shall have no right of subrogation whatsoever under this Guaranty with respect to any monies due it from Tenant for sums paid by Guarantor pursuant hereto unless and until Landlord shall have received payment in full of all sums at any time due Landlord under the Lease.

    5.    Recovery Not a Bar.  No action or proceedings brought or instituted under this Guaranty against the Guarantor and no recovery obtained in pursuance thereof shall be any bar or defense to any further action or proceeding which may be brought under this Guaranty by reason of any further default or defaults of Tenant.

    6.    Impairment.  The liability of the Guarantor shall not be deemed to be waived, released, discharged, impaired or affected by reason of the release, modification or discharge of the Tenant's liability in any creditors, receivership, bankruptcy or other proceedings (including Chapter 11 bankruptcy proceedings or other reorganizations proceedings under the Federal Bankruptcy Code), or by reason of the rejection or disaffirmance of the Lease in any proceedings.

    7.    Modification.  There shall be no modification of any of the provisions of this Guaranty unless the same be in writing and signed by the Guarantor and the Landlord.

    8.    Costs and Expenses.  If the Landlord shall engage an attorney to enforce any or all of Landlord's rights or remedies hereunder (including, without limitation, to be involved in any

MAY-23-2005-MON 09:02 AM                                                   P. 029

legal proceeding in bankruptcy to preserve, protect or otherwise defend the validity and enforcement of the Lease or this Guaranty), or to defend any action brought by the Guarantor in connection with this Guaranty, then, in any such event, the Guarantor shall pay all of Landlord's costs and expenses, including a reasonable attorney's fee, in connection therewith.

9.    Severability.    If any provision, paragraph, sentence, clause or wording of this Guaranty shall be determined to be invalid, void or unenforceable under applicable law, then the same shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions, paragraphs, sentences, clauses and words shall nevertheless remain in full force and effect.

10.    Construction.    The Guarantor acknowledges and agrees that the laws of the State of Alabama shall govern the construction and interpretation of this Guaranty.

11.    Binding Effect.    All of the terms, agreements and conditions of this Guaranty shall extend to and be binding upon the Guarantor, its respective successors and assigns, and shall inure to the benefit of the Landlord, its successors and assigns.

IN WITNESS WHEREOF, the Guarantor has executed this Agreement on the date first above written.

_____(L.S.)
**Jimmy Tselios**

STATE OF _____    )
                                                :
COUNTY OF _____    )

I, the undersigned authority, a Notary Public in and for said State and County, hereby certify that **Jimmy Tselios**, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the above and foregoing instrument, he executed the same voluntarily on the day same bears date.

Given under my hand and official seal of office this the ____ day of May, 2005.

(Seal)                                          _____
                                                Notary Public
                                                My commission expires:_____

3

legal proceeding in bankruptcy to preserve, protect or otherwise defend the validity and enforcement of the Lease or this Guaranty), or to defend any action brought by the Guarantor in connection with this Guaranty, then, in any such event, the Guarantor shall pay all of Landlord's costs and expenses, including a reasonable attorney's fee, in connection therewith.

9.    Severability.  If any provision, paragraph, sentence, clause or wording of this Guaranty shall be determined to be invalid, void or unenforceable under applicable law, then the same shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions, paragraphs, sentences, clauses and words shall nevertheless remain in full force and effect.

10.    Construction.  The Guarantor acknowledges and agrees that the laws of the State of Alabama shall govern the construction and interpretation of this Guaranty.

11.    Binding Effect.  All of the terms, agreements and conditions of this Guaranty shall extend to and be binding upon the Guarantor, its respective successors and assigns, and shall inure to the benefit of the Landlord, its successors and assigns.

IN WITNESS WHEREOF, the Guarantor has executed this Agreement on the date first above written.

_____ (L.S.)
**Jimmy Tselios**

STATE OF _____    )
                                                :
COUNTY OF _____    )

I, the undersigned authority, a Notary Public in and for said State and County, hereby certify that **Jimmy Tselios**, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the above and foregoing instrument, he executed the same voluntarily on the day same bears date.

Given under my hand and official seal of office this the _____ day of May, 2005.

(Seal)                                          _____
                                                   Notary Public
                                                   My commission expires: _____

3

**Exhibit "C"**

(Underlying Docments)